Rose M. JACOBS, Plaintiff-Appellee Cross-Appellant,

v.

The MARTIN SWEETS COMPANY, INC., Defendant-Appellant Cross-Appellee.

Nos. 75–2406, 75–2407.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 13, 1976.

Decided Feb. 11, 1977.

**366**

Marvin J. Hirn, Ronald D. Ray, Greenebaum, Doll, Matthews & Boone, John S. Reed, II, Louisville, Ky., for appellant in No. 75–2406 and for appellee in No. 75–2407.

Abner W. Sibal, Gerald D. Letwin, Equal Employment Opportunity Comm., Washington, D. C., for amicus curiae E.E.O.C.

James C. Hickey, Ewen, MacKenzie & Peden, Louisville, Ky., for appellee in No. 75–2406 and appellant in No. 75–2407.

Before WEICK and McCREE, Circuit Judges, and MILLER, Judge, United States Court of Customs and Patent Appeals.*

MILLER, Judge.

This action, involving alleged sex discrimination in employment because of unwed pregnancy, was brought by Rose M. Jacobs ("Jacobs") against The Martin Sweets Company, Inc., Louisville, Ky. ("Sweets Co." or "Company"), under the provisions of Title VII of the Civil Rights Act of 1964 ("Act"), Pub. L. No. 88–352, 78 Stat. 253, 42 U.S.C. § 2000e et seq. Sweets Co. appeals from that portion of the district court's amended judgment awarding back wages to Jacobs in the sum of $7,500 pursuant to 42 U.S.C. § 2000e–5(g).[1] Jacobs appeals from that portion of the amended judgment dismissing the class action allegations of her complaint with prejudice. She also asks that the district court's award of attorney's fee be reversed, with certain directions for recomputation. We affirm those portions of the amended judgment pertaining to back wages and the class action issue; the portion pertaining to attorney's fee is modified to the extent that the fee awarded is to be increased by the sum of $1,000 for services rendered on this appeal.

## BACKGROUND

Jacobs began her employment with the Sweets Co. on December 9, 1970, as executive secretary to James Hanna, the Senior Vice President. She received an increase in salary to $600 per month on April 1, 1971, an outstanding annual performance evalua-

---

* The Honorable Jack R. Miller, sitting by designation pursuant to Chapter 13, Title 28, U.S.C.

1. 42 U.S.C. § 2000e–5(g) provides in pertinent part as follows:

    If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate. . . . Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

tion in February of 1972, and a second increase in salary to $633 per month in May of 1972; however, during 1972 she was warned by Hanna on several occasions about her tardiness and absenteeism. During her employment with the Company she was unmarried.

Jacobs' testimony was that on September 8, 1972,[2] Hanna called her into his office, shut the doors, and said he had heard from other employees that she was pregnant, which she confirmed; that he declared he could not tolerate it, Martin Sweets, the President, would never approve of it, and he was giving her two weeks' notice, with her last day to be September 22;[3] and that Hanna stated "there would be no problem whatsoever with getting me a more than good recommendation if I needed it." Following this meeting, Jacobs contacted the District Office of the Equal Employment Opportunity Commission (EEOC), where she spoke with the Department Director, Robert Jeffries, who advised that it would be illegal for the Company to fire her due to her pregnancy and suggested that she get the matter in writing if at all possible. On September 12 she presented two documents to Hanna: (1) a request that he write a letter of recommendation, with the letter indicating it was not due to her work but to her pregnancy that she was being let go; and (2) a notice to her, for Hanna's signature, stating that the Company was required to terminate her employment due to her being pregnant and not married "in order to avoid embarrassment to the company and to yourself," and that the Compa-

ny intended to issue her a letter of recommendation. She said that Hanna refused to sign and that, while leaving his office, she heard him place a telephone call and ask for the Company's attorney.

Jacobs further testified that on the morning of September 14, S. J. Popson, one of Sweets Co.'s vice presidents, came into her office and told her that Hanna had directed him the night before to supervise her immediate transfer to the Purchasing Department and that she was to clean out her desk, get all her things together, turn in her keys, and not return to the office except under supervision; that this was the first she had heard about a change in her assignment, Hanna having said nothing to her about it. She stated that Popson told her that her pregnancy had been mentioned to him by Hanna; that he did not tell her the transfer was temporary; and that later that day, after her typewriter, office equipment, and other personal things had been moved to the Purchasing Department, she filed a charge against the Company with the EEOC. She also stated that the Purchasing Agent told her that Hanna had called him, also the night before, about the transfer and had said it was to try to get her to quit.[4] Jacobs further stated that her job in the Purchasing Department was "just a clerical position"; that, notwithstanding several attempts on her part, Hanna refused to see her until September 28, when she told him that she had filed suit with the EEOC and would not be returning to the Company; and that she came in on September 25, picked up her paycheck of

2. All dates *infra* relate to 1972.

3. This is corroborated by the testimony of Barend Crawford, who was a payroll clerk for the Company at the time and was employed by the Company from July 1, 1970, until April of 1973. He stated that on September 21 or the morning of September 22 he took the paychecks that were to be distributed on September 22 to Hanna for signature; that these were prepared by a computer service firm; that "when anyone leaves the company you do not make a computer check, you adjust their pay up to the last day that they are there and issue them a typewritten check from the company"; that "[n]o one was ever, to my knowledge, given an

adjusted pay unless they were going to be dismissed or had quit the company"; that Hanna told him that Jacobs' computer check would be voided and that he (Crawford) should give her a typewritten paycheck adjusted to what should be paid "through this payday"; that he prepared such a check; and that Hanna told him "This is to protect ourselves in case she doesn't come back."

4. John Bowyer, the Purchasing Agent at the time, could not remember such a call from Hanna and denied Hanna had ever told him the reason for the transfer was to force Jacobs to quit.

September 22, and worked in the Purchasing Department,[5] but that the main reason was to try to see Hanna about staying on with the Company in her former position.

Additional testimony of Jacobs was that she received a notice from Hanna, dated September 18, advising, *inter alia*, that "under current company policy any employee who becomes pregnant shall be allowed to work as her physical condition permits and as long as the work will not jeopardize her health"; that she also received a copy of a notice, dated September 18, to the Purchasing Agent from Hanna, subject: "Temporary Transfer of Rose Jacobs," reciting that due to the senior officer of the Company being on an extended trip and the need for only one executive secretary, it was more feasible to use the senior executive secretary and to transfer Jacobs to the Purchasing Department "to fulfill the overload requirements,"[6] with no change in hours and no reduction in salary.[7]

S. J. Popson testified that Hanna had telephoned him the evening of September 13 and told him that he was to supervise Jacobs' transfer from Hanna's office to the Purchasing Department; that he was not to leave Jacobs alone in the office; that he should get her key to the office after her things were moved out, lock the office, and not allow her to return; that Hanna's instructions were carried out the next morning; and that he did not recollect whether Hanna told him to tell Jacobs that the transfer was temporary. The record also shows the following on direct examination of Popson by Jacobs' lawyer:

Q. Did Mr. Hanna discuss Miss Jacobs' pregnancy with you that evening in that conversation?

A. In that conversation? All I can say is I can't imagine that it wasn't discussed. I wouldn't take the conversation [sic] and do the job without asking why. And I'm sure that we did go into the ramifications. But as far as the details of what was discussed, I really couldn't remember specifics.

Robert Jeffries, Department Director of the District Office of the EEOC during the period involved, stated that he took a telephone call on or about September 12 from a lawyer for Sweets Co., inquiring about the law pertaining to pregnancy; that the lawyer "asked me to fully explain the laws where the pregnant party was married or unmarried"; and that the conversation pertained to the Company and Jacobs, who had previously talked to him about the Company and her being pregnant and unmarried.

The Company's attorney, Marvin Hirn, testified that his assistant telephoned the District Office of the EEOC in September of 1972; that the call was precipitated by Hanna's call to him on September 12, during which "we entered into a discussion of the company's pregnancy policy"; and that, based on the information his assistant received from the EEOC, he advised Hanna that Jacobs should be permitted to work as long as she· was able.

Hanna insisted, *inter alia*, that he did not tell Jacobs that she was fired or would be fired because she was pregnant and unmarried. He stated that Jacobs "temporary" transfer to the Purchasing Department was to help with the overload and because he did not trust her after she had tendered to him what he labeled a "false statement" for him to sign; that, prior to Martin Sweets'

---

5. It does not appear that Jacobs was paid for work on September 25. Referring to September 22, Hanna stated: "She didn't have anything else coming after that date."

6. John Bowyer, the Purchasing Agent, testified that there was an increased work loan in his department from July or August until the end of 1972; that there had been an increased work load in previous years; and that he could not remember whether Jacobs had previously done any work for his department. Crawford, *supra*

note 3, who had helped Jacobs move from her office to the Purchasing Department, testified that Jacobs had never been temporarily transferred while he was with the Company; also that Jacobs' duties in the Purchasing Department were "clerical."

7. It appears that Jacobs did little work after the transfer and was on vacation or leave without pay from September 18 to September 22.

departure for an extended overseas trip on August 31, Sweets told him to utilize Sweets' secretary during his absence; that highly sensitive negotiations involving the Company had been going on, of which only Sweets, Hanna, and Sweets' secretary were to have knowledge; that he had previously considered using Jacobs for additional help in the Purchasing Department during Sweets' absence; and that, although the Company's Policies and Procedures Manual provided for termination of employment of pregnant employees at the end of six months of pregnancy, this had never been enforced, the Company allowed such employees to work as long as they were able, consistent with their health, and jobs were held open for employees on pregnancy leave.[8] He agreed that it was a common occurrence in the Purchasing Department that the work load increased during the last six months of the year.

## OPINION

### Discrimination Issue

■ The district court's determination that, because she was pregnant and unmarried, Jacobs was given two weeks' notice of termination of her employment on September 8, 1972, and was transferred, without consultation and against her wishes, from her job as executive secretary to the Senior Vice President of the Company to a clerical position in the Purchasing Department on September 14, is supported by substantial evidence and is not clearly erroneous. *Smith v. South Central Bell Telephone Co.,* 518 F.2d 68 (CA 6 1975). The district court's further determination that these actions constituted a termination and/or constructive termination of Jacobs' employ-

ment is also supported by substantial evidence, including the reasonable inferences to be drawn therefrom. *See NLRB v. Tennessee Packers, Inc., Frosty Morn Division,* 339 F.2d 203 (CA 6 1964). Although there is conflicting testimony in the record, the district court had the benefit of hearing some of the key witnesses and observing their demeanor.[9]

■ That Sweets Co. intended the two weeks' notice of termination given Jacobs on September 8 to be carried out is shown by Crawford's testimony that Hanna told him that Jacobs' computer check would be voided and that he should give her a typewritten check adjusted to what should be paid through September 22, in accordance with the practice when employees left the Company. The naked fact that Jacobs came in and worked on September 25 for the purpose of trying to see Hanna does not overcome the fact that her employment had been earlier terminated and/or constructively terminated. Sweets Co. contends that Jacobs' transfer to the Purchasing Department was "temporary." However, Hanna himself testified that he didn't think he orally told Jacobs it was temporary, so it was not until she received a copy of the notice of September 18 to the Purchasing Agent (a document that could be considered self-serving) that the transfer was labeled "temporary." It is further contended that Jacobs voluntarily quit, but there are two answers to this: (1) "It cannot be said that a man voluntarily quits the employment of the master after he has been notified that his services are no longer desired." *Stark Distillery Co. v. Friedman,* 150 Ky. 820, 823, 150 S.W. 981, 983 (1912); and (2) Although

---

8. Crawford, *supra* notes 3 and 6, stated that he believed the Company's policy was to allow female employees to work for six months after pregnancy and that to his knowledge the six-month policy was not changed before he left the Company in 1973. The evidence discloses that only two of the Company's employees were pregnant after March 14, 1972; that one took pregnancy leave at the end of her eighth month of pregnancy, while the other, who was hired while she was pregnant, took pregnancy leave five days before her baby was delivered.

9. We note the finding of the district court that Jacobs had conceded "[w]ith commendable candor" that she had not at all times been diligent and punctual in attendance; also, while Hanna claimed that her transfer was to help with the increased work load and because of matters arising from Martin Sweets' leaving the country, the increased work load was a common occurrence, Jacobs had never been transferred before, and her transfer occurred *over two weeks after Sweets departed.*

Jacobs received a copy of the notice from Hanna to the Purchasing Agent that there would be no change in her hours and salary, the fact remains that the transfer from her position as executive secretary to clerical duties in the Purchasing Department was a demotion which, at the time of the transfer on September 14, had the appearance of being permanent. Taking into account the reason for such a demotion—that she was pregnant and unmarried, the conditions involving the transfer could properly be considered intolerable and her "quitting" involuntary. See *NLRB v. Tennessee Packers, Inc., Frosty Morn Division, supra.*[10]

The dispositive question is whether the district court erred in concluding, as a matter of law, that the termination and/or constructive termination of Jacobs' employment constituted a violation of section 703 of the Act, 42 U.S.C. § 2000e–2(a), which provides:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Sweets Co. argues that "Jacobs has never shown that had she been a male expectant parent, she would have been treated any differently by the Sweets Company." The sophistry of this argument is that it equates pregnancy with the condition of "expectant parent" in a male. Pregnancy is a condition unique to women, so that termination of employment because of pregnancy has a disparate and invidious impact upon the female gender. The point of the argument is that there must be men and women similarly situated who are treated in a disparate manner. The point is not well taken, for it would effectively exclude pregnancy from protection in *all* Title VII cases. The Supreme Court has stated that maternity leave rules directly affect "one of the basic civil rights of man." *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 640, 94 S.Ct. 791, 796, 39 L.Ed.2d 52, 60 (1974).[11] To exclude such a basic civil right from protection against invidious employment termination would be contrary to the policy to which Title VII is directed, namely: that race, religion, nationality, and sex are irrelevant factors in employment opportunity.[12] *Griggs v. Duke Power Co.,* 401 U.S. 424, 436, 91 S.Ct. 849, 856, 28 L.Ed.2d 158, 167 (1971); *Holthaus v. Compton & Sons, Inc.,* 514 F.2d 651 (CA 8 1975).

---

10. Sweets Co. cites *Muller v. United States Steel Corp.,* 509 F.2d 923 (CA 10), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975), for the proposition that its conduct did not achieve the level of a constructive discharge. However, the factual situation in *Muller* was entirely different. As pointed out in *Steel Indus., Inc. v. NLRB,* 325 F.2d 173 (CA 7 1963), also cited by Sweets Co., the factual situation varies from case to case, and the employer's "complete freedom" exists only when discrimination is absent.

11. Although the *Cleveland Board of Education* case was decided under the due process clause of the Fourteenth Amendment, the language quoted from the Court's opinion came from *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), which involved the equal protection clause of the Fourteenth Amendment. Title VII extends beyond the reach of the equal protection clause. *Satty v. Nashville Gas Co.,* 522 F.2d 850, 855 (CA 6 1975), *cert. granted,* —— U.S. ——, 97 S.Ct. 806, 50 L.Ed.2d 788 (1977).

12. The recent holding of the Supreme Court in *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), that exclusion of pregnancy from the risks covered by an employer's disability *benefits* plan does not violate Title VII, can hardly be regarded as precedent for excluding pregnancy from protection against *invidious* employment termination. *See Armour & Co. v. Wantock,* 323 U.S. 126, 133, 65 S.Ct. 165, 168, 89 L.Ed. 118, 123–24 (1944).

Sweets Co. next argues that Jacobs has not shown that she would have received different treatment had her premarital sexual activity not resulted in pregnancy and that the EEOC's guideline applicable to pregnancy [13] is unconstitutional because it is "an attempt to control the moral policies of a private company with respect to the premarital sexual behavior of individuals of both sexes." However, the district court found that Jacobs' employment was terminated because she was pregnant and unmarried—not because of her premarital sexual activity. Apart from the EEOC's guideline, which, in the absence of a showing that it conflicts with the letter or spirit of the Act (not shown here), is entitled at least to some weight, the district court's finding establishes a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[14] Sweets Co.'s argument that the "unmarried" portion of the finding renders Jacobs' pregnancy different for purposes of Title VII is supported only by its citation to *Wardlaw v. Austin School District* (not officially reported), the facts of which are substantially different. 10 F.E.P. Cases 892 (W.D.Tex. 1975). The argument impliedly suggests that this court permit "artificial, arbitrary, and unnecessary barriers to employment" (condemned in *Griggs v. Duke Power Co.,* supra at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 164) in the case of unwed pregnancy, while declaring such barriers unlawful in the case of wed pregnancy. However, there is no evidence that such a classification has any rational relationship to the normal operation of Sweets Co.'s business. *Phillips v.*

*Martin Marietta Corp.,* 400 U.S. 542, 544, 91 S.Ct. 496, 497–98, 27 L.Ed.2d 613, 615–16 (1971). *See Griggs v. Duke Power Co., supra* at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 164.

In view of the foregoing, we hold that the district court committed no error in concluding, as a matter of law, that the termination and/or constructive termination of Jacobs' employment constituted a violation of section 703 of the Act, 42 U.S.C. § 2000e–2(a).[15]

*Class Action Issue*

The district court found that Jacobs' employment discrimination claim was entirely separate from her attack on Sweets Co.'s policy with respect to medical payments expense and sick pay during pregnancy; that there was no evidence that Jacobs suffered any actual or threatened loss or was likely to suffer any loss as a result of that policy; that Jacobs was not employed by Sweets Co. at any time during which it would have been appropriate and timely for her to demand payment under or challenge the validity of that policy; and that Jacobs did not make any actual claims for pregnancy-related expenses that were denied by the Company. These findings are supported by substantial evidence and are not clearly erroneous. *Smith v. South Central Bell Telephone Co., supra.*

The decisive issue is whether the district court erred in determining that Jacobs lacked both the requisite standing under Article III of the Constitution and class action status under Fed.R.Civ.P. 23(a),[16] so that she was not a proper party

13. 29 C.F.R. § 1604.10(a) provides as follows:
 A written or unwritten employment policy or practice which excludes from employment applicants or employees because of pregnancy is in prima facie violation of Title VII.

14. The order and nature of proof prescribed by the Supreme Court in *McDonnell Douglas*, a racial discrimination case under Title VII, is applicable in sex discrimination cases. *Edwin L. Wiegand Co. v. Jurinko*, 414 U.S. 970, 94 S.Ct. 293, 38 L.Ed.2d 214 (1973).

15. The parties do not contest the district court's computation of the $7,500 in back wages.

16. The rule states:
 *(a) Prerequisites to a class action.*
 One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the

to maintain a class action attacking the Company's pregnancy/sick pay/medical expense policy.[17]

Jacobs argues that her claim of unlawful termination of employment because of pregnancy involves all present or future employees adversely affected by all the Company's pregnancy policies. However, we agree with the district court that she has not satisfied "the threshold requirement imposed by Art. III of the Constitution that those who seek to invoke the power of federal courts must allege an actual case or controversy." *O'Shea v. Littleton*, 414 U.S. 488, 493, 94 S.Ct. 669, 675, 38 L.Ed.2d 674, 682 (1974). We note that Jacobs' complaint alleges that her employment was unlawfully terminated because of her sex (when she would have been approximately six-weeks pregnant). However, she has not alleged, much less shown, "specific, concrete facts" demonstrating that the Company's policy regarding medical payments expense and sick pay during pregnancy was applied to her. *Warth v. Seldin*, 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343, 360 (1975). As found by the district court, she did not make any actual claims for pregnancy-related expenses that were denied by the Company.[18]

With respect to Jacobs' status under Fed. R.Civ.P. 23(a), she cites *Tipler v. E. I. du-Pont deNemours & Co.*, 443 F.2d 125, 130 (CA 6 1971), and *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 247 (CA 3), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975), both of which held that a complainant who is no longer employed may still be an adequate representative of a class of employees. However, unlike the complainants in those cases, Jacobs has not shown that she belongs to the class she seeks to represent. *See Linda R. S. v. Richard D.*, 410 U.S. 614, 617 n.4, 93 S.Ct. 1146, 1148 n.4, 35 L.Ed.2d 536, 540 n.4 (1973). Jacobs says it is "difficult to understand how the interests of the class are protected by allowing the unlawful practices to continue until some other employee has the termerity [sic] to challenge the Sweets Company policies," but this ignores the requirement of Fed.R.Civ.P. 23(a)(3) that Jacobs' claim be "typical" of the claims of the class.[19] The district court correctly determined that Jacobs lacked class action status under Fed.R.Civ.P. 23(a).[20]

### Attorney's Fee

Jacobs contends that the district court abused its discretion in making an award of $3,500 for attorney's fee and asks that this portion of the court's amended judgment be reversed with directions that a fee be awarded for services in the district court and on appeal based on hours times hourly rate times other relevant factors, principally the contingent nature of the representation. She points out that the affidavit accompanying her motion for award of fee shows that her counsel had devoted 129.3 hours on the case; that an award of $3,500 would amount to only $27 per hour.

Section 706(k) of the Act, 42 U.S.C. § 2000e–5(k), provides that: "In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party . . . a reasonable attor-

---

representative parties will fairly and adequately protect the interests of the class.

17. This policy appears to be the sole basis set forth in the complaint for Jacobs' class action.

18. Jacobs' allegation in her complaint that the Company unlawfully maintained a policy requiring female employees to terminate their employment at the end of the sixth month of pregnancy would also propose a class to which she does not belong. Moreover, Jacobs produced no evidence that the employment of any of the Company's employees was terminated in accordance with such a policy.

19. There is no evidence showing any other Sweets Co. employee similarly situated to her. *Jurinko v. Edwin L. Wiegand Co.*, 477 F.2d 1038, 1041 n.7 (CA 3), *cert. granted, judgment vacated, and case remanded for other reasons*, 414 U.S. 970, 94 S.Ct. 293, 38 L.Ed.2d 214 (1973).

20. The district court said: "Class action status in this case appears vulnerable to attack under the provisions of 23(a)(1), 23(a)(2), and, most significantly, under 23(a)(3). We regard this as a "determination" that Jacobs lacked class action status under Fed.R.Civ.P. 23(a).

ney's fee as part of the costs . . . .." Although this court has interpreted the statute to require the award of a fee that would approximate the customary fee in the community for similar work, it is clear that more than a simple division of an award by the number of hours devoted to the case is needed to support a conclusion that the district court abused its discretion. *Singer v. Mahoning County Board of Mental Retardation*, 519 F.2d 748 (CA 6 1975). On the record before us, we are not persuaded that the district court abused its discretion. However, it is evident that Jacobs' counsel has expended considerable professional time and effort on this appeal, so that the fee allowed below should be increased to reflect such services.

Those portions of the amended judgment pertaining to back wages and the class action issue are affirmed. That portion pertaining to attorney's fee is modified to the extent that the fee awarded below is increased by $1,000 for services rendered on this appeal.

Affirmed and modified.