Clara M. HARRIS, Plaintiff,

v.

RICHARDS MANUFACTURING CO., INC., Defendant.

No. C–77–2700.

United States District Court, W. D. Tennessee, W. D.

March 31, 1981.

---

Barbara Dickey, Memphis, Tenn., for plaintiff.

David Copus, Linda Rosenzweig, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HORTON, District Judge.

After hearing and reviewing all of the evidence and considering the arguments of counsel, the Court makes the following findings of fact and conclusions of law in this case:

### FINDINGS OF FACT

1. The defendant Richards Manufacturing Company [Richards] is a subsidiary of William Rorer, Inc., and employs approximately 775 employees in its plant in Memphis, Tennessee.

2. The plaintiff Clara M. Harris began work at Richards on November 18, 1968, as a packager in softgoods. At the time of her discharge, February 15, 1977, only one other black employee had worked at Richards longer than the plaintiff.

3. On October 4, 1971, plaintiff was promoted to printing press operator which was traditionally a man's job. One reason plaintiff sought the job was its higher pay. However, instead of being promoted to the $2.88 an hour wage male operators were paid, plaintiff received only a $.15 an hour raise. During the three years in that job, plaintiff never achieved the $2.88 an hour rate of pay. Sometime during 1974, plaintiff complained to her supervisor who told her to go and see the Personnel Director, Mr. Charles Force.

4. Plaintiff did speak with the Personnel Director, Mr. Force, who told her he would think it over. Approximately two weeks later, he informed plaintiff that she did not qualify for a raise. He did, however, give her a long questionnaire about her job with a request that she fill it out. Plaintiff did so. When plaintiff returned the questionnaire to the Personnel Director, he informed her she would not get a raise but told her of an opening in otology inspection for which she could bid. Plaintiff won the job in otology inspection and began that job in October of 1974. On plaintiff's personnel jacket she was classed as a "Final Inspector." The job bid and company terminology defined the job as "Inspector (Otology)."

5. At some point in 1975 plaintiff expressed an objection to her supervisor about a white woman, Mrs. Melba Dodson, who was being brought into otology inspection as a Utility Inspector for the black inspectors to train for the higher paying position she was slated to receive. The Court does find however that plaintiff did not bid on this job, because she felt it would not serve any purpose to do so. There were black co-workers who, plaintiff felt, should have been considered for the position.

6. Before the incident with the training of the Utility Inspector, an Atomic Energy Commission (AEC) inspector had toured the plant and told employees he was leaving a telephone number with personnel and if they had any complaints, they could request the number and contact him. After Melba Dodson came into her department, plaintiff decided she needed to speak with the government inspector and went to the black Assistant Personnel Director, Mr. Claude Smith, and requested the number. Mr. Smith told plaintiff that he did not have the number available as it was locked in a safe located in the office of the Personnel Director, Mr. Force. Due to her past experiences with Mr. Force, plaintiff testified she was reluctant to approach Mr. Force for the number and instead paid another employee $5.00 to divulge the number to her.

7. On January 19, 1976, plaintiff called the government inspector from her home and relayed to him her concerns about the pay and promotion practices of the defendant.

8. The next morning the government inspector called the defendant's personnel director, Mr. Force, and informed him that plaintiff had called him about a complaint and suggested the defendant try to handle it at the company level. The personnel director informed plaintiff's supervisor that he wished to speak with plaintiff.

9. On the afternoon of January 20, 1976, three or four minutes before the employees could leave work, the employees had their coats on and were standing by the door when plaintiff decided to sit back down at her inspection station and put her head down on her table while waiting for the shift buzzer to ring. Suddenly, her former supervisor, Mr. Pete Read[1] appeared and began shouting that he had caught her sleeping on the job and that Mr. Force wanted to see her and made her go to the office of the Personnel Director.

10. When plaintiff arrived in Mr. Force's office he requested to know why she

---

1. Mr. Read was the supervisor over plaintiff during the time when the incident about which she complained to the AEC occurred. However, Mr. Read was no longer her supervisor when she voiced her complaint to the AEC.

had called the government inspector. Mr. Force told plaintiff that she should bring all her complaints to him and stop calling the government. Plaintiff testified that she was intimidated by this confrontation and told Mr. Force that she had no complaints. At that point Mr. Read said he had a complaint. He reported that he had discovered plaintiff sleeping on the job and that he wanted plaintiff fired. However, a reprimand was never issued about plaintiff's alleged sleeping on the job. Plaintiff was admonished to stop going to the government with her complaints and was told that the company handled its own problems within the company. Plaintiff's supervisor told her she was a revolutionary, had problems and needed a psychiatrist. Plaintiff then went home.

11. Plaintiff ultimately decided that calling the government inspector did her no good, for after each time she called, he would contact the defendant about her call and it was causing problems for her at work. So plaintiff went to the Equal Employment Opportunity Commission (EEOC) and filed a charge of discrimination against the company on January 20, 1976. The charge was based upon harassment in retaliation for making complaints to government officials about discrimination. Official notice of this charge was received by defendant on March 1, 1976.

12. Sometime in early 1976, plaintiff's supervisor, Jimmie Mason[2], had given a deposition to the EEOC during its investigation of the charge of employer discrimination. Also, in early 1976, Mr. Mason was interviewed by a representative of the AEC relative to plaintiff's complaints. Mr. Mason admitted that the "news got back around to me" that plaintiff had complained to the AEC, a few days before he was interviewed by the AEC agent.

13. During the month of April two memos were written by Mr. Mason to Mr. Force in regard to Clara Harris. On April 20, 1976, Mr. Mason wrote a two page memo detailing alleged complaints he had received from two of plaintiff's co-workers about problems they had getting along with

Mrs. Harris. Yet Mr. Mason admits that he had never written a memo, dealing with co-worker's complaints about any other of his employees but that he felt the situation with plaintiff warranted such a memo. These co-workers were not called as defense witnesses at trial. On April 26, 1976, Mr. Mason wrote a second memo reporting that plaintiff had not worked scheduled overtime on two occasions in April, once when she had an appointment with her hairdresser and once when she was scheduled to play with the firm's ball team in a ballgame. The Court finds from the testimony that white co-workers with plaintiff had been excused on occasions when they presented the same type of excuses for not wishing to work overtime. After plaintiff's discrimination complaints were known to supervisors, the defendant apparently increased the amount of overtime scheduled for plaintiff to work and thus attempted to prevent her from participating in activities with her co-workers.

14. The 1976 charge with the EEOC resulted in a determination in August, 1976. Plaintiff chose not to sue upon the charge after she was issued a right to sue letter.

15. During her years in otology inspection, plaintiff occasionally worked on Saturday inspecting other product lines such as the orthopedic line, as had another less senior otology inspector, Margie Davis.

16. The inspection section of the defendant's plant was not separated from the manufacturing section until 1973. Therefore when plaintiff was a packager, she was still in the inspection department and it is possible that plaintiff occasionally inspected orthopedic goods while she was listed as a packager in inspection. When plaintiff was promoted to final inspector for otology in 1974 the inspection department, then referred to formally as product control, was divided into 3 segments:

1) *Orthopedics/Hardgoods*—Final inspection of bone implants and screws and other prosthetic devices with the naked eye in hygienic conditions.

2. Mr. Mason became plaintiff's supervisor in December, 1975.

2) *Otology*—Final inspection of small inner ear implants under a microscope under hygienic conditions.

3) *Floor Inspection*—Inspection of otological and orthopedic products while in the process of manufacture. The partially machined goods are inspected as they come off the machines and are often greasy or dirty. This is also referred to as in-process inspection.

17. Sometime in November or December 1976, the 90 day time period within which plaintiff could file her right to sue letter and begin a private suit against defendant, expired.

18. In early February 1977, plaintiff again filed a complaint with the successor agency to the Atomic Energy Commission, the United States Energy Research and Development Administration (ERDA).

19. On February 9, 1977, plaintiff again filed a charge of discrimination against defendant with the EEOC and alleged the defendant discriminated against black employees in promotional and training opportunities and maintained a discriminatory wage differential based upon race and sex.

20. Plaintiff told two co-employees that she had filed such a charge.

21. On the day that plaintiff filed the charge with the EEOC, her supervisor Jimmie Mason placed a memo in her personnel file stating that plaintiff had refused to work overtime on Saturday, February 7[3] 1977, due to the fact she had business to attend to and had refused to explain the nature of that business. On that Saturday, plaintiff had been meeting with an attorney for the EEOC and this meeting culminated in the filing of the formal charge on Wednesday, February 9th. The note to the two personnel directors and department head stated that this was an unexcused absence and future absences, absent a reasonable excuse, would result in disciplinary action. Plaintiff never saw that memo.

22. On the day after the EEOC charge was filed, again plaintiff's supervisor placed

a memo in her personnel file and directed copies to the personnel directors and the department head. The memo stated:

In 1975 only Clara Harris and Margie Davis were working in the Otology inspection area. Kathie Higginbotham came into this area in February 1976, and Geneva Stagg in April.

I have had complaints from Kathie, from Margie, and from Geneva at one time or another about Clara's attitude toward those with whom she works, and her attitude toward racial issues. I advised them that probably the best thing to do was for them to ignore her remarks unless it became unbearable, rather than confront Clara and possibly make matters worse.

Kathie later asked to be moved from the area and I moved her as soon as I could. At one time Kathie and Clara were barely on speaking terms.

Geneva asked to be moved about the first of 1977 and I moved her from the otology area and Zenobia Shaw into the area about the middle of January, 1977. Zenobia has also complained about the atmosphere and tension she feels while trying to work. She specifically mentioned Clara as the major cause of her feeling this way.

About the first of February I moved Geneva back into Otology because of a surge of production and she tells me that Clara will hardly speak to her except in a harsh or sarcastic manner.

I cannot ignore this problem any longer, yet I have no one else I can move into this area now. Therefore I intend to move Clara into the floor inspection area probably Monday, February 14, 1977. I hope Ed Meade will be bothered less than those with whom she presently works. I am afraid she will dislike this change because I asked her if she would like to move out before I asked Geneva and she said she did not want to. I then told her that I would move someone else at that

---

3. The date on the memo should be February 5, 1977 for Saturday fell on the fifth not the seventh.

time, but sometime in the future I would like for her to become acquainted with at least one more area of inspection because of vacation or sickness of other persons in our department. I am reluctant to make this move but I feel as though I have no choice due to all the circumstances involved. If you have any suggestions please let me know.

This letter makes it clear that there was no alleged change in policy with regard to cross-training inspectors as defendant contends. The only surge in production which is mentioned in the memo is a surge in the otology department itself. It is equally clear that the reasons for the transfers out of the department were reasons of personal preferences of the employees, not the business of cross-training. The move which plaintiff was asked to make subsequent to this memo was to floor inspection as mentioned in the memo, not to orthopedic as defendant has previously contended. The intent which this memo, written one day after plaintiff had filed an EEOC charge and had let employees of defendant know she had done so, reveals is that of transferring plaintiff out of the hygienic and technical otology inspection area and placing her in an area with only one male co-worker and have her perform less technical inspections of in-process goods in a less desirable environment. At no place does the memo evidence an intent to temporarily transfer plaintiff or to benefit her by learning a new product line. Mr. Mason admits he took the word of the co-workers about their complaints and never investigated or spoke with plaintiff to hear her side of it.

23. The request to plaintiff to move in January, to which the memo refers, occurred on January 14, 1977, when plaintiff's supervisor asked her if she would like to transfer to another area. Plaintiff was not informed that this was a change in company policy and was led to believe the move was voluntary and would be done on the basis of seniority, with employees having less seniority moving first. At first, plaintiff's supervisor did not tell her where he wanted to transfer her. He eventually let it be known she would go to floor inspection. When plaintiff declined, no repri-

mand was put in her file aside from the references to the incident made in the above-quoted memo. The employee who did transfer was transferred because she wanted to do so and was transferred to orthopedic not floor inspection. Another black otology inspector, Margie Davis, was asked to move and declined. No action was taken against her and she was not requested to move from otology again until June, 1977, when she moved to orthopedic inspection where she stayed from 1977 until 1979. The defendant did not call as witnesses the employees who allegedly voiced complaints about plaintiff.

24. In February 1977, the plaintiff had more seniority than the one other otology inspector, Margie Davis, who had not transferred to another line and plaintiff had as much experience inspecting orthopedic products on an overtime basis as did this employee.

25. On February 14, 1977, as foreshadowed by her supervisor's memorandum to her file, plaintiff was asked to move to the floor inspection area. When she asserted her seniority rights, her supervisor took her to the office of the Personnel Director Charles Force. Mr. Force told her she was being asked to move due to complaints from co-workers and did mention that she needed to be cross trained. Plaintiff attempted to elicit information about those complaints but her supervisor and Mr. Force refused to elaborate. Plaintiff was told she would have to take the transfer or quit or else be fired. She was given overnight to think it over. That action followed company policy as stated in the employee handbook. It provided that an employee will not be fired on the spot but will be given overnight for tempers to cool.

26. The Personnel Director, Mr. Force, wrote a memo in regard to this meeting of February 14, 1977. Although the memo dwelt on the reason for the change to be the alleged change in company policy, it did illuminate that plaintiff's fears of permanent transfer were well founded for it stated: "Jimmy [plaintiff's supervisor] again explained to Clara this would *probably* be a

temporary move until she became familiar with in-process inspection." (Emphasis added) The Court finds that plaintiff was correct in her feelings that the defendant was attempting to punish her for her complaints to government agencies, particularly EEOC about race discrimination by transferring her to an isolated and less hygienic area of the plant with one male co-worker. The effect was to downgrade the type of work she did with the defendant's expectation being that she would remain there or terminate her employment.

27. The defendant's employee handbook defines a temporary transfer as one for 15 days or less but states these temporary transfers will be determined on the basis of 1) lack of work, 2) ability, 3) skill and 4) least job seniority. Plaintiff acted properly in asserting her seniority rights even if the transfer was to have been merely temporary. She was the most senior member of otology inspection; and, at least one co-worker, with less seniority, had not been rotated and had equal cross-training with plaintiff. The Court also finds that lack of work in otology was not a problem for in his February 10, memo, plaintiff's supervisor had noted that Geneva Stagg had been moved back into otology due to a surge of otology production. The move contemplated for Mrs. Harris was a transfer under the employee handbook which defines transfer as a move to "other jobs in their department or to another department."

28. Although the Personnel Director claimed that on the afternoon or evening of the 14th there was a meeting between himself, Mr. Mason, and the division head to discuss options on how to deal with plaintiff, Mr. Mason denied any attendance at or knowledge of such a meeting.

29. On the morning of February 15, 1977, plaintiff was summoned to the office of the Personnel Director. At some point either during the meeting on February 14, or on February 15, 1977, plaintiff mentioned to those present that she had just filed a fresh EEOC complaint against the company. Plaintiff was again given the choice of quitting or taking the transfer. Plaintiff again asserted her seniority, requested details of the complaints of her co-workers and stated that she would not move to floor inspection. Plaintiff was then fired for insubordination which is defined in the employee handbook as "refusal to perform service connected with job assignment and/or refusal to obey any reasonable order given by management." However, the disciplinary standard applicable to insubordination calls for either 1) a written reprimand, 2) suspension, or 3) termination. Defendant chose the most severe remedy. After she was fired, Mr. Force refused to permit her to return to her work area to get her belongings, placed a chair in front of the door of his office and sat in it to block plaintiff's exit. The police were called to remove plaintiff from the premises even though the defendant had a guard on the premises. Although the plaintiff was extremely angry and the meeting had become heated, plaintiff made no threats against those outside the meeting and did not threaten harm to the company's operation or products. Plaintiff did wish to leave and obtain a witness to her firing which the company's complaint procedure allowed but was refused this right. Thus the plaintiff, who weighs approximately 100 pounds, was locked in an office with three men who each apparently weighed more than 170 pounds until police could come to remove her. The police arrived and escorted plaintiff to her work area to get her belongings and escorted her to her car and off the premises.

30. After plaintiff refused to take the transfer to floor inspection, it was taken by Kathie Higginbotham, who was an employee of less than one year and was not assigned to otology as was plaintiff. She was a utility inspector. Margie Davis was not requested to move to floor inspection at that time. When she did move in June, 1977, it was to orthopedic inspection.

31. From 1975 to the time plaintiff was discharged in 1977 only one other employee, a white metal finisher, was discharged for insubordination. The charge of insubordination was based on his refusal after repeated requests to supply the doctor's excuses required by the company to excuse excess absences.

32. Though other discrimination charges had been filed against the defendant in the past, they had all been filed after employees had already been terminated. Thus, plaintiff was the only employee to file discrimination charges against defendant with government agencies while she was still working for defendant.

33. Although Mr. Force was not technically served with plaintiff's EEOC charge of February 9, 1977, until March 1, 1977, he and Mr. Mason were made aware of the charges by plaintiff in the meeting of either the 14th or 15th of February, 1977.

34. On February 16, 1977 plaintiff amended her charge of discrimination to include her termination by the defendant because of her actions in filing complaints against the defendant.

35. By way of a rebuttal witness, plaintiff presented a former black employee of defendant who had voiced complaints about not being paid as high a wage as white workers in the same job. The Court finds that very employee was harassed on the job and received a series of reprimands which were placed in his personnel file, much in the same manner as was employed with the plaintiff. This employee finally went to the President of the defendant company to explain that he wanted to keep his job and was being harassed and only wished to keep his job and be paid properly. This witness' supervisor and Group Leader were both aware he had spoken to the President. Not long after this talk with the company President, the employee was fired, allegedly for refusal to work overtime.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this case under 28 U.S.C. § 1343(3) (42 U.S.C. § 1981 claim) and 42 U.S.C. § 2000e–5(f) and 28 U.S.C. § 1331(a) (Title VII claim).

2. The Court has jurisdiction over the employer who has more than fifteen employees under 42 U.S.C. § 2000e(b) and over the employee under 42 U.S.C. § 2000e(f).

3. Title VII specifically prohibits retaliation for filing EEOC claims or opposing discriminatory practices when it states:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this sub-chapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). This section has been interpreted to cover not only complaints to the EEOC but also to encompass initiation of administrative agency proceedings relative to discrimination and use of an employer's internal grievance procedures. *Hochstadt v. Worcester Foundation for Experimental Biology, Inc.*, 425 F.Supp. 318 (D.Mass.1976), aff'd, 545 F.2d 222 (1st Cir. 1976). In order to establish a prima facie case of retaliation, a plaintiff must show a protest of practices contrary to Title VII or the making of a discrimination charge; that she was subjected to adverse action by her employer; and that her conduct was linked to the employer's retaliatory action. Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to establish a legitimate, nondiscriminatory reason for taking the action adverse to the plaintiff. Then the plaintiff may attempt to prove the reason was pretextual. *Gunther v. County of Washington*, 602 F.2d 882 (9th Cir. 1979); *Mead v. U. S. Fidelity & Guaranty Co.*, 442 F.Supp. 114 (D.Minn. 1977); *Hochstadt, supra*. Thus, the basic formulation of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) applies in a retaliation case under Title VII.

4. The Court finds that the plaintiff, Clara Harris, has established a prima facie case of discrimination in retaliation for the filing of charges or the lodging of complaints with federal agencies [4] and the EEOC. The defendant's Personnel Di-

---

**4.** The complaints to federal agencies arose due to the defendant's receipt of government con-

tracts for many of their products.

...tor, Mr. Force, was notified by the federal agencies to which plaintiff complained immediately upon her complaint. From the time of her first complaint to the AEC in January 1976, plaintiff's harassment at work began. She called the AEC on January 19, 1976. On January 20, 1976 she was ordered to report to the Personnel Director without being told the reason, was instructed to stop calling the federal government with her complaints, was then accused of sleeping on the job, was told by a plant supervisor that she was a revolutionary, and was informed she needed psychiatric help. That same day plaintiff filed her first charge of discrimination with the EEOC. The plaintiff's supervisor, Mr. Mason, was interviewed by an AEC representative relative to plaintiff's complaints in early 1976. Also in early 1976, Mr. Mason was deposed by the EEOC during its investigation. The news was definitely getting around the defendant's premises as to the plaintiff's complaints relative to racial policy even before those interviews and depositions. On the heels of the interview and deposition of Mr. Mason in early 1976, Mr. Mason began putting memos into plaintiff's personnel file, unbeknownst to the plaintiff. The first memo of April 20, 1976, detailed alleged complaints about plaintiff from co-workers. None of these co-workers were called as witnesses by the defense at trial. One co-worker, Margie Davis, testified for plaintiff and the defendant did not cross examine her at all. On April 26, 1976, Mr. Mason inserted in plaintiff's file a memo complaining about two failures to work overtime. The Court has already found that excuses similar to the ones plaintiff advanced for failure to work overtime were accepted on the part of other white co-workers of plaintiff's and no such memo was placed in these other workers' files. The Court finds the proximity of these adverse memos and the taking of Mr. Mason's deposition by EEOC and his interview with the AEC to be more than just coincidental. The Court also notes that once EEOC issued plaintiff a right to sue letter in August, 1976, the defendant lessened the pressure on the plaintiff while the ninety days in which to file suit ran. That time period expired in December of 1976 and plaintiff did not sue. At the beginning of January, 1977 the first request to leave the otology department came. Plaintiff declined and a less senior employee *chose* to transfer to orthopedics. In early February, 1977, the plaintiff filed a complaint with ERDA, the successor to AEC and on February 9, 1977, her second EEOC charge was filed. Plaintiff told co-workers she had filed those charges. The day plaintiff filed the EEOC charge, Mr. Mason again placed a memo in plaintiff's file and stated plaintiff had refused to work overtime on Saturday, February 5, 1977[5] and would only tell him she had a business appointment. He characterized this absence as unexcused and threatened disciplinary action if it happened again. This memo was also placed in plaintiff's file without her knowledge and in contravention of the company's policy, as embodied in its employee handbook, to show employees copies of disciplinary reports and have employees sign them. The business to which plaintiff attended on February 5, 1977, was speaking with an EEOC attorney regarding the filing of her second EEOC charge. On Wednesday, February 9, 1977, the formal EEOC charge was filed by plaintiff. On Thursday, February 10, 1977, another memo was clandestinely placed in plaintiff's personnel file by her supervisor. It reiterated the allegations of co-workers about plaintiff and set the stage for the transfer of plaintiff to floor inspection. On Monday, February 14, 1977, the fifth day after plaintiff had filed her fresh EEOC charge and as foreshadowed by a memo written the day after the charge had been filed, plaintiff was asked by her supervisor to move to floor inspection. Upon her refusal based on her seniority rights, plaintiff was taken to a meeting in the Personnel Director's office and was told she would take the job or be fired. For the first time, she was told of the alleged complaints of co-workers. Management refused to supply her with the substance, much less the details, of the allegations. It was either at this Monday meeting or the meeting on

Tuesday morning that plaintiff stated to the Personnel Director and Mr. Mason she had filed a new EEOC charge. The Court specifically notes that although the Personnel Director swore under oath that notice of the second EEOC charge did not reach him until March 1, 1977, when he received the official notice from EEOC, his testimony was directly contradicted by that of Mr. Mason who candidly admitted plaintiff mentioned the new charge at a meeting with Force on either the fourteenth or fifteenth of February. Since plaintiff told co-workers of her new filing, the Court is confident that much as Mr. Mason stated the "news got back to me" before the official notice of the first EEOC charge was received, the news of the second charge had gotten around once plaintiff filed it and told co-workers.

On the morning of the fifteenth, plaintiff reported to her station in otology inspection. She was taken by Mr. Mason to the office of the Personnel Director, where she was closeted with Force, Mason and Smith. When she again sought to assert her seniority, she was summarily fired for insubordination, even though the employee handbook classified that as the most severe form of discipline for such an infraction. She was then held incommunicado and against her will by the three men and police were called to remove her from the premises. The Court finds this final behavior especially reprehensible.

The Court finds this case to be analogous to *Jacobs v. Martin Sweets Co.*, 550 F.2d 364 (6th Cir. 1977), *cert. denied*, 431 U.S. 917, 97 S.Ct. 2180, 52 L.Ed.2d 227 (1977). In *Jacobs*, once the plaintiff executive-secretary was discovered to be pregnant, though unmarried, she was summarily demoted, at the same pay and benefits, to a purchasing clerk which the company alleged to be a temporary move. Such a transfer, the Sixth Circuit held, amounted to a constructive termination of employment as it had the appearance of being a permanent move. Thus, the Court held that the conditions involving the transfer "could properly be considered intolerable and her 'quitting' involuntary," 550 F.2d at 370 (citation omitted), and upheld a judgment against the employer under Title VII. Much as in *Jacobs*, the present plaintiff was shunted off to an isolated corner in retaliation for her filing of discrimination complaints against the company. The transfer was not temporary but appeared to be permanent, and was an intolerable move in that it demoted plaintiff, a high seniority employee, from a highly technical and skilled job in hygienic surroundings to an unskilled, eyeball inspection of dirty and greasy in-process orthopedic goods in an isolated area of the plant. The fact that defendant alleges plaintiff could have prevented being fired by taking the job does not isolate it from liability. The fact that plaintiff was told to take the transfer was not a reasonable request and even had she voluntarily quit without the threat of firing for noncompliance, the quitting would have been involuntary. *Jacobs, supra.*

Therefore the Court finds that plaintiff has established a prima facie case of retaliatory discharge by a preponderance of the evidence. Although a long-time employee, plaintiff's alleged troubles with management and working conditions commenced in January, 1976 with her first complaint to an agency of the United States Government. For the next year, the company systematically followed a course designed to harass and intimidate Ms. Harris while papering her personnel file with clandestine, hearsay accusations of co-workers and complaints for minor infractions for which other co-workers were not cited. Although defendant has attempted to tie the discharge in February, 1977, to only the January 1976 EEOC charge, the Court finds that plaintiff's discharge was directly affected by the fresh EEOC and ERDA charges filed just days before her termination for alleged insubordination. Thus, plaintiff has established the required causal connection between her complaints against the defendant's discriminatory policies and the defendant's retaliatory action which culminated in her firing on trumped-up grounds.

5. The defendant asserts that it had legitimate nondiscriminatory reasons for proposing the transfer to plaintiff and for firing her due to her refusal to take it. This

Court is mindful of the recent Supreme Court elaboration on the employer's burden in a Title VII case in *Texas Department of Community Affairs v. Burdine*, —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In *Burdine*, the Court clarified the fact that the burden which shifts to the defendant once the plaintiff has proved a prima facie case of discrimination is not the burden of persuasion—which always stays with the Title VII plaintiff—but is merely the burden to rebut the presumption of discrimination by producing evidence that the action taken against the plaintiff was done for a legitimate nondiscriminatory reason. The Court explained that:

> The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.

—— U.S. at ——, 101 S.Ct. at 1094 (citations and footnotes omitted). The Court then added that "the employer's burden is satisfied if he simply 'explains what he has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons." —— U.S. at ——, 101 S.Ct. at 1095 (quoting *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1979)).

■ Reading *Burdine* as establishing a liberal standard as to the defendant's rebuttal of the plaintiff's prima facie case of discrimination, the Court finds that although the court is not persuaded that the defendant was actually motivated by the proffered reasons, the defendant has advanced an explanation for its treatment of the plaintiff through the personnel file evidence as to alleged disharmony with co-workers and the alleged need to cross-train

inspectors. However, as noted by the Supreme Court, the inquiry now moves to a new level of specificity.

■ As the Court explained in *Burdine*, The plaintiff retains the burden of persuasion. *She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision.* This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

—— U.S. at ——, 101 S.Ct. at 1095 (emphasis added). The Court finds that the plaintiff has carried the burden of persuasion under *Burdine*. The defendant's proffered reason for plaintiff's transfer, which resulted in her discharge, in order to separate plaintiff from co-workers for reasons of worker disharmony caused by plaintiff, is not demonstrably plausible under the facts of this case. The only evidence advanced by defendant on this issue was the hearsay allegations in the reports put in plaintiff's personnel file by Mr. Mason. The defense did not produce the allegedly complaining co-workers to testify as to the reports of their displeasure with plaintiff and did not question the one co-worker, Margie Davis, called by plaintiff. The transfer was not part of a new company policy for reclassifying inspectors and was not offered to plaintiff only after everyone less senior to her was asked to cross train. The true reason for attempting to force plaintiff to transfer was to isolate her from other workers, demote her and harass her for the filing of discrimination complaints. When plaintiff asserted her seniority rights and refused the transfer, the defendant achieved the result it wanted—to get rid of an employee who was the only worker to dare to make discrimination complaints while she was in the employ of the defendant. The employer's proffered legitimate nondiscriminatory

reasons are found by this Court to be definitely "unworthy of credence" and plaintiff has persuaded this Court that discriminatory reasons "more likely motivated the employer." *Burdine, supra,* at ——, 101 S.Ct. at 1095. The Court finds by a preponderance of the evidence the alleged legitimate, nondiscriminatory reasons advanced by defendant to be a pretext. Plaintiff has carried the burden of proof on the Title VII claim for retaliatory discharge and this Court awards judgment to plaintiff on the Title VII claim.

6. The Court likewise finds that plaintiff has proven her case under 42 U.S.C. § 1981. The Sixth Circuit has noted that the discriminatory intent necessary to prove a Title VII claim also serves to prove the discriminatory intent requisite to a finding under the Civil Rights statutes. *Grano v. Department of Development,* 637 F.2d 1073, 1081–1082 (6th Cir. 1980). The plaintiff has proven a prima facie case under section 1981 which requires that:

A person alleging a § 1981 violation must first establish that his employment terms vary from those which his employer accords to similarly situated white workers.

*Long v. Ford Motor Co.,* 496 F.2d 500, 505 (6th Cir. 1974). Plaintiff has established that she was treated in a harassing manner due to her filing of discrimination claims and that her attempted transfer was an employment term varying from those accorded to similarly situated white workers. Although defendant articulated the legitimate, nondiscriminatory reason by way of rebuttal to the section 1981 claim, *Long, supra* at 506, defendant, as in the Title VII claim, has been shown by a preponderance of the evidence to have employed this reason merely as a pretext for racial prejudice. *Id.* Thus, plaintiff has proven her case under 42 U.S.C. § 1981 and this Court awards her judgment on the 1981 claim.

7. In regard to the relief awarded under Title VII, by virtue of 42 U.S.C. § 2000e–5(g) and (k) this Court 1) orders immediate reinstatement of the plaintiff Clara M. Harris by the defendant as a final otology inspector; 2) enjoins the defendant from subjecting plaintiff to any special conditions of employment or denying plaintiff equal employment opportunity in any manner subsequent to her reinstatement; 3) awards plaintiff full back pay less any wages earned from other employment during this time, and benefits from the date of her termination on February 15, 1977, to her date of reinstatement; and 4) awards reasonable attorney's fees and costs.

Counsel for plaintiff is to submit within 30 days of entry of this order financial data as to the back-pay to which plaintiff is entitled and any interim wages earned by plaintiff, as well as the value of the accrued benefits which she is due. Plaintiff's attorney will submit within 30 days of entry of this order, a statement of her services from which the Court may determine the reasonable amount of attorney's fees and costs. A copy of all financial data shall be served upon counsel for defendant who is given ten days from receipt of this data to respond, if they desire. For the purpose of determining these awards, the Court retains jurisdiction of the cause. Should the parties reach a settlement within the thirty day time period upon this aspect of the case, the Court will pass upon its reasonableness.

In regard to the relief awarded under the section 1981 claim, the court awards to plaintiff compensatory damages and punitive damages. It has long been established that under § 1981 both compensatory and punitive damages are recoverable. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975). An award of punitive damages is permissible under section 1981 even though the 1981 action is joined with a Title VII action. *Claiborne v. Illinois Central Railroad,* 583 F.2d 143, 154 (5th Cir. 1978). Under section 1981, the Court may award compensatory damages for embarrassment, humiliation and mental anguish. *McCrary v. Runyon,* 515 F.2d 1082, 1089 (4th Cir. 1975). Such damages for emotional distress "may be inferred from the circumstances as well as proved by the testimony." *Gore v. Turner,* 563 F.2d 159, 164 (5th Cir. 1977). There must however, be a sufficient causal connection be-

tween the defendant's illegal actions and the injury to the plaintiff. *Id.* The Court finds the requisite causal connection between the humiliation, embarrassment and mental distress caused the plaintiff by defendant's actions of systematic harassment on the job, culminating in her firing and ultimately being escorted by police from the building in the presence of her fellow employees. Plaintiff was belittled by one supervisor who called her a revolutionary and told her she needed psychiatric help. Plaintiff was separated from her co-workers through the defendant's manipulation of overtime hours. Finally, plaintiff's pride in her achievement of the responsible position of final otology inspector was degraded by the defendant's humiliating demand that she be demoted, without just cause, to an entry level type job in the in-process inspection. Thus the Court awards the plaintiff $10,000.00 in compensatory damages for emotional distress.

Plaintiff is likewise entitled to an award of punitive damages due to the oppressive actions on the part of defendant.

The rule in civil rights cases for recovery of punitive damages is that the defendant must have exhibited oppression, malice, gross negligence, willful or wanton misconduct, or a reckless disregard for the civil rights of the plaintiff.

*Darensbourg v. Dufrene,* 460 F.Supp. 662, 665 (E.D.La.1978). The defendant's conduct in this case was so malicious and oppressive as to indicate that defendant intended to get rid of plaintiff as an employee because she had complained to governmental agencies about discrimination in its plant. Particularly reprehensible was the Personnel Director's blocking of the exit from his office by placing a chair in front of the door and sitting in it. Thus, defendant held plaintiff under house arrest without just cause and called the police to escort plaintiff to her work area, for the purpose of getting her personal items, in full view of co-workers and then escort her from the premises. The only purpose the Court can

reasonably infer from defendant's conduct is that defendant decided to make a chilling example of plaintiff and show what would happen to any employee who dared complain to the federal government about working conditions in its plant. Such actions constituted a malicious design to harass, intimidate, embarrass and ridicule the plaintiff. Such unreasonable conduct is not acceptable in a society where law and justice are held in high esteem. As a result of defendant's actions plaintiff suffered obvious embarrassment and humiliation at the defendant's hands. Such outrageous conduct warrants an award to plaintiff of $25,-000.00 in punitive damages.

It is therefore, by the Court

ORDERED that judgment is rendered for the plaintiff on both her Title VII and section 1981 claims. Plaintiff is awarded immediate reinstatement to her position as final otology inspector, back pay less wages earned in the interim, and benefits from her date of termination on February 15, 1977, to her date of reinstatement, the amount of back pay and benefits to be determined by the Court if the parties fail to reach a settlement within thirty days of entry of this order. Plaintiff is to submit financial data upon the award of back pay and benefits as well as attorney's fees and costs within thirty days of entry of this order and serve such papers upon defendant. Defendant may respond within ten days of receipt of this data. Plaintiff is rendered a judgment of $10,000.00 in compensatory damages and $25,000.00 in punitive damages.