George Ann Martin HELD, Plaintiff-Appellee, Cross-Appellant,

v.

GULF OIL COMPANY, Defendant-Appellant, Cross-Appellee.

Nos. 80–5400, 80–5401.

United States Court of Appeals, Sixth Circuit.

Argued May 4, 1982.

Decided Aug. 13, 1982.

William N. Ozier, Bass, Berry & Sims, Nashville, Tenn., for defendant-appellant, cross-appellee.

David M. Pack, Pack, Neil & Price, Nashville, Tenn., for plaintiff-appellee, cross-appellant.

Before LIVELY and KEITH, Circuit Judges, and GILMORE,* District Judge.

GILMORE, District Judge.

This is a sex discrimination case in which complainant alleges that the defendant discriminated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiff claims that the defendant subjected her to disparate treatment in her capacity as a retail marketer assigned to defendant's Tennessee-Kentucky marketing district and constructively discharged her from employment.

Plaintiff, a 35 year old white female, was employed by defendant beginning December 1, 1974 at a salary of $1,133 per month. She was hired as part of Gulf Oil's program to increase its percentage of minority employees. She was interviewed in Atlanta, Georgia, and sent to training school in Houston prior to employment. Upon completion of her training, she and a black male were assigned to Gulf's Nashville, Tennessee district office.

* Honorable Horace W. Gilmore, Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

Plaintiff claims that she was assigned the job of self-serve marketer rather than the more desirable jobs of marketing representative or retail marketer solely because of her sex, and that from that point forward was the subject of continued discriminatory treatment.

Plaintiff contends that she was required to work in a manner, and assume burdens, totally different from her male counterparts. Plaintiff was called upon to work extremely long hours, complete volumes of paper work, unstop toilets, clean or pick up the area surrounding her self-serve stations, and was regularly asked to visit the stations in response to emergencies late in the evening and very early in the morning. She claims that her work load was at least twice that of her male counterparts. At trial, she testified that she was never able to take a vacation because of the constant demands of her job. Finally, plaintiff testified that she was constantly subjected to sex-based innuendoes.

The case was tried in the Spring of 1980, and on July 15, 1980, the District Court entered a memorandum decision and order finding that defendant had violated Title VII. It held:

> In summary, Gulf has not advanced and could not advance any credible excuse for its conduct towards plaintiff. Without discussing the niceties of a prima facie case, the shifting burden of persuasion, or the articulation of a legitimate nondiscriminatory reason, this Court holds that plaintiff has proved overwhelmingly that solely because of sexual discrimination practiced by defendant through its employees, she was literally chased from her job.

Joint App. Vol. I, p. 32.

The trial court, in ruling for the plaintiff, made the following findings (inter alia):

1. Because of her sex, the plaintiff was assigned to the least desirable job of self-service marketer, the more desirable jobs being those of marketing representative or retail marketer;

2. Plaintiff, as a self-service marketer, was required to work longer hours than her male counterparts;

3. Plaintiff was continuously treated in a discriminatory manner;

4. A separate personnel file was kept on plaintiff;

5. Plaintiff was given increased hours and other burdens that male employees did not receive;

6. Repeated warnings were given to the plaintiff not to socialize with male employees;

7. A course of treatment by management and fellow employees, with management's knowledge, involved frequent sex-based references; and

8. The plaintiff was constructively discharged from her job.

A hearing on damages was subsequently conducted, and on September 26, 1980, the District Court entered an order awarding attorney fees in the amount of $18,370, and damages to plaintiff of $14,474.74. Defendant has appealed, and plaintiff has taken a cross-appeal on the issue of damages only.

The following issues are presented for review:

1. Whether the District Court's finding that Gulf Oil discriminated against plaintiff because of her sex is clearly erroneous;

2. Whether the present action was timely filed with the EEOC within 180 days after alleged acts of discrimination; and

3. Whether the findings which supported the District Court's conclusion that plaintiff was "constructively discharged" are clearly erroneous.

■ After a close review of the record, we are persuaded that there is substantial support in the record for the findings of the trial court that plaintiff was the object of serious and continuous sex discrimination. The findings of the trial court are not clearly erroneous. *See Smith v. South Central Bell Telephone Co.,* 518 F.2d 68 (6th Cir.

1975); *Heard v. Mueller Co.*, 464 F.2d 190 (6th Cir. 1972).[1]

█ It is clear that plaintiff was subjected to disparate working conditions solely because of her sex, and there is no doubt that such disparate working conditions may form a predicate for a Title VII violation. In *Harrington v. Vandalia-Butler Bd. of Ed.*, 585 F.2d 192 (6th Cir. 1978), the trial court held that the plaintiff, a female physical education teacher, had been discriminated against on the basis of sex. In affirming this finding, the Court stated:

> The trial judge's finding that Mrs. Harrington was discriminated against on account of her sex has support in the record. The evidence showed that the facilities provided Mrs. Harrington.... were neither equal nor even comparable to those provided male physical education teachers.

*Id.* at 193.

The difficult question in this case, however, is whether any of the discriminatory acts occurred within 180 days prior to the plaintiff filing her complaint with the Equal Employment Opportunity Commission on February 16, 1978. Appellant argues that no discriminatory conduct occurred within the 180 day period prior to the filing of plaintiff's administrative claim on February 16, 1978, and therefore 42 U.S.C. § 2000e–5(e) bars plaintiff's claim.[2]

With reference to this claim, the Supreme Court of the United States in *United Airlines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed. 571 (1977) stated:

> A discriminatory act which is not made the basis of a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed .... separately considered, it is merely an unfortunate event in history which has no present legal consequences.

Plaintiff's termination was effective December 15, 1977, and her administrative claim was filed with the EEOC on February 16, 1978. Thus, any incident occurring more than 180 days prior to February 16, 1978, is legally insignificant. This result, however, does not obtain where subsequent identifiable acts of discrimination occur within the critical time period and are related to the time-barred incident. *Smith v. American President Lines*, 571 F.2d 102 (2d Cir. 1978); *Woodard v. Virginia Board of Bar Examiners*, 420 F.Supp. 211 (E.D.Va. 1976); *aff'd* 598 F.2d 1345 (4th Cir. 1979). In the latter case, the District Court pointed out:

> When a person challenges continuous discriminatory conduct rather than any single discriminatory act, the 180 day limitation period of Title VII ... (is) not operative.

420 F.Supp. at 214, n.3.

Additional appellate court authority supports the continuous discrimination construction of the subject statute. See *Williams v. Norfolk & Western Railway Co.*, 530 F.2d 539 (4th Cir. 1975); *Macklin v. Spector Freight Systems*, 478 F.2d 979 (D.C. Cir.1973); *Cox v. United States Gypsum Co.*, 409 F.2d 289 (7th Cir. 1969).

█ Thus, if the discriminatory acts commenced prior to the 180 day period and there was a continuous pattern of discrimination that continued into the 180 day period, plaintiff may still maintain her action even though single discriminatory acts prior to the 180 days period are barred.

Defendant argues, however, that in January 1977 plaintiff received several independent distributorships and reasons that the increase in plaintiff's territory was possible because of a change in the operation of the self-serve stations. Defendant contends that 10 to 14 self-serve stations handled by

---

**1.** It is significant that one of the principal witnesses for defendant, Mr. Lawrence Brittain, the Nashville District Manager for Gulf, who assigned plaintiff to company-owned self-serve stations, and who generally supervised plaintiff, was not believed by the trial court. The trial court specifically found that Mr. Brittain's testimony was not credible.

**2.** 42 U.S.C. § 2000e–5(e) states in part:

TIME FOR FILING CHARGES. A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred....

the plaintiff were converted into mini-markets which were run by independent contractors, thereby obviating the need for plaintiff to keep track of inventory, sales, and restocking. Defendant thus contends that, assuming the existence of sex discrimination, the discrimination ended in January of 1977, well outside the 180 day period.

There was testimony in the record, however, that rebuts defendant's assertion, and the trial judge obviously accepted such testimony.[3]

3. Plaintiff testified that her work load did not decrease as a result of the shift to mini-markets and, if anything, it increased. It was still necessary to visit the stations and perform her usual tasks and, because the corporation had a stake in the profits of the markets, it was still necessary to perform an inventory. Defendant's own guidelines (see testimony of John Bailey) call for the marketer to visit each station every day for one hour to one and one-half hours. Defendant's witness, however, testified that once per week was enough in many circumstances.

Witness Brittain testified that by January of 1977 the plaintiff's work load had been reduced by 40 to 50 per cent and that this decrease coincided with the conversion to mini-markets. Other witnesses, however, testified that the conversion took place as of July 1977 (see testimony of witness Williamson, a Gulf management employee) or was not completed until late 1977 or early 1978. In this regard, witness Corban stated:

(541 In speaking to the conversion of the self-serve operation to mini markets)

A. ... It's when we first started we were converting the stations, and we had markets, Gulf was responsible for Allied products, which meant cigarettes or whatever we sold. It was after January of '77, it was almost a year later when we started selling that merchandise to the labor contractors, and they were responsible for keeping up with the Allied products. It was almost a year after I came back in the Self-Serve Program that happened.

Q. Do you remember telling us today that it was after January of 1978, after Miss Martin left Gulf, the Allied products were handled only by a contractor?

A. It started changing before then, but it was a slow thing, you know. They'd do one station and another station. This happened over about a six month period. But I'd say it was at least December or January before everything was complete.

Q. December or January of What?

A. December of 1977 or January of '78. And I'm saying these months, what I believe the time schedule was, I couldn't tell you the exact date.

\* \* \* \* \* \*

... It happened during that year, over a six month period, something like that. It was a slow thing, ...

Q. (Defense counsel) Mrs. Corban, didn't that transition start in 1975, and completed in 1976, for all practical purposes?

A. Not to my knowledge, no sir.

Q. Do you know how many markets were operated by Grand Old Markets when you took over in January of '77?

A. I would say around fourteen. (Witness is speaking to the self-serves in both Tennessee and Kentucky)

\* \* \* \* \* \*

Q. Wasn't Grand Old Markets totally responsible for allied products?

A. Not when I went to Self-Serve (Jan. of '77), no. I can tell you why I know, because I paid the bills for cigarettes, I wrote drafts for the beer, and I paid the vendors. I know I paid the bills myself. That was over a several month period. And I know the marketer was responsible for going out at least once a month and counting everything. They'd bring these reports in to me, and I'd make sure everything was correct.

(Corban continues at page 543)

Q. How many of the self-serves located generally in Nashville had allied products handled by contractor in January of 1977?

A. I don't know, but I don't think any. I think Grand Old Markets in this area were the last to convert, I think. I know Louisville started converting first, best of my memory.

Q. You could be mistaken about it, too?

A. I certainly could, but I don't believe I am.

This witness also testified that management personnel for the defendant met with her prior to the trial and advised her that she would not have to testify if plaintiff would withdraw the subpoena.

WITNESS STARR RENEE CROWDER (549) In reference to the plaintiff's situation at the time she quit her employment:

A. (Paraphrase—was plaintiff's work getting easier at the time the witness stopped having job contact with the plaintiff—this would have been several months before plaintiff quit)

THE COURT: How long had it been since you had any connection with Gulf then?

WITNESS: I would think several months, maybe a year, Your Honor.

Q. (Mr. Ozier) Could you tell a difference at the time you stopped having any dealings with Gulf that her work load was lighter?

A. No, sir, I could not. (584)

Q. (585) Well, would you say the operation of those self-serve stations had improved during the time she was in charge of them and you worked with her so that it took less

■ We are convinced that the discriminatory acts found by the trial court occurred throughout the term of plaintiff's employment. Although the trial court's findings did not make express reference to the dates of occurrences of various discriminatory acts, a close reading of the transcript indicates that the sex discrimination against plaintiff continued through the effective date of her termination. Her work load never lightened throughout the entire period of her employment; sex-based innuendos continued throughout the period of employment; and she was continually excluded from the terminal. All of these things were found by the trial court to be because of her sex. There is significant testimony in the record, including that of plaintiff, Mrs. Crowder, and Olinda Gonzalez, to support such findings. Since this testimony supports a finding that discriminatory acts continued throughout her period of employment, the plaintiff's action is not time barred because of 42 U.S.C. § 2000e–5(e).

Finally, appellant argues that a constructive discharge is precluded as a matter of law because the legal standard for a constructive discharge has not been satisfied in this case. Gulf's argument is based on the proposition that a constructive discharge cannot be found unless the Court finds:

> ... that the defendant engaged in a deliberate or intentional course of conduct calculated to force the employee into an involuntary resignation.

Appellants' brief, p. 40.

■ In this Circuit, the law governing constructive discharge is set forth in *Jacobs v. Martin Sweets Co., Inc.*, 550 F.2d 364 (6th Cir. 1977). *Jacobs, supra*, establishes that the constructive discharge issue depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee. *Jacobs*, citing *NLRB v. Tennessee Packers, Inc.*, 339 F.2d 203 (6th Cir. 1964), endorsed the "... well recognized rule in labor relations law that 'a man is held to intend the foreseeable consequences of his conduct.'" *Jacobs* distinguished *Muller v. United States Steel Corp.*, 509 F.2d 923 (10th Cir. 1975), a case which apparently involved a stricter test. *Jacobs* is in accord with the rule in the Fifth Circuit that a finding of constructive discharge requires the determination that: "... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Bourque v. Powell Electric Mfg.*, 617 F.2d 61, 65 (5th Cir. 1980).

■ In the instant case, it is clear that the defendant was impermissibly motivated by sex bias in-so-far as plaintiff's job assignment was concerned. In addition, plaintiff was subjected to various forms of treatment indicating sex-based opprobrium, including statements implying that her sexual charms had something to do with sales, plaintiff's absolute exclusion from the supply terminal, constant lectures pertaining to her sex life, and her use by management as an errand girl. All of these events formed a continuous course of discriminatory conduct which was linked to plaintiff's initial job assignment and the consistent management belief that women and marketing shouldn't mix. Thus, an environment of sexual bias was tolerated and fostered by her employer.

Moreover, as has already been stated, plaintiff was required to work longer hours and in a manner completely different from any of her male counterparts solely because of her sex. Under the standard set forth in *Jacobs, supra*, the above facts are sufficient to sustain the trial court's determination that the plaintiff was constructively discharged. The court notes that the trial court had the opportunity to view the witnesses and determine their credibility. The trial judge chose to believe the plaintiff, and that decision is conclusive unless clearly erroneous.

---

of her time to get done what Gulf wanted her to do?

A. No, sir, I wouldn't.

■ With reference to plaintiff's cross-appeal on the issue of damages, the Court finds no error in the assessment of damages by the trial court. The damages assessed were well within the range of the testimony. .

Therefore, for the reasons given, the judgment of the District Court is affirmed. Costs may be taxed.