**M. Scott MITCHELL and Margaret Mitchell, Plaintiffs,**

v.

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY, INC., and Cigna Corporation, Defendants.**

**No. 87–CV–73645–DT.**

United States District Court, E.D. Michigan, S.D.

Oct. 6, 1988.

Ronald Reosti, Detroit, Mich., for plaintiffs.

Susan Salisbury, Philadelphia, Pa., for defendants.

MEMORANDUM OPINION
AND ORDER

JULIAN ABELE COOK, Jr., District Judge.

The above-captioned case is a diversity action for wrongful discharge and handicap

discrimination under Michigan state law. The Complaint herein was filed in Wayne County Circuit Court on September 11, 1987, and was removed to this Court by a petition dated October 5, 1987.

In 1964, Plaintiff M. Scott Mitchell ("Mitchell") became a group life insurance sales employee of Defendant Connecticut General Life Insurance Co. ("CG"), a subsidiary of Defendant CIGNA Corporation ("CIGNA"). In 1971, Mitchell became a CG account executive assigned to Detroit. In 1973, he was diagnosed as suffering from multiple sclerosis ("MS").[1] He nevertheless maintained a career as "one of the most successful [CG] salespersons in the country." Response to Motion for Summary Judgment at 2. He achieved the highest earnings of his career in 1986; his next most successful year was 1985. It is undisputed that at the time of the company actions of which Mitchell complains, he was the most productive sales agent in CG's Detroit office.

In 1985, for reasons "in no way related to [Mitchell's] physical condition," Response to Motion for Summary Judgment at 2, Mitchell and his office supervisor, Hildreth Bailey, agreed that the Detroit office would make certain adjustments to help with Mitchell's caseload and "relieve [his] stress." Letter from Hildreth Bailey to Thomas Spina, May 14, 1985, exhibit B to Response to Motion for Summary Judgment.[2]

On October 27, 1986, Mitchell had an MS "exacerbation," which kept him largely homebound until December 6, 1986. It is undisputed that he conducted some business from his home during this period, though it is disputed whether he spent any time at his office. See Affidavit of M. Scott Mitchell, August 17, 1988, Attachment to Response to Motion for Summary Judgment, at 6–7, paragraph 12.

On December 9, 1986, the company informed Mitchell that it had transferred some portion of his accounts[3] to other salespeople. The company told Mitchell that these customers would not be assigned back to him, and that if he wanted to continue working, he had to work with the remaining clients.

Mitchell argues that this action by the company differed drastically from what he and Bailey had agreed would occur, and thus constituted constructive termination. Mitchell alleges that CG's actions in December 1986 and January 1987 made him "distraught" and directly caused a new and severe exacerbation of his illness[4] which he claims has rendered him totally and permanently disabled. Complaint at 2–3, paragraphs 10, 13; Response to Motion for Summary Judgment at 10.

In January 1987, Mitchell applied for company disability benefits. His claim was approved. It is undisputed that he received about $104,000 in combined wages and disability benefits in 1987, and now receives approximately $65,000 per year in benefits alone.

Mitchell claims in Count I (handicap discrimination) that CG's actions in December 1986 and January 1987 were prompted by bias or prejudice concerning the abilities of MS sufferers.

Mitchell claims in Count II (breach of an implied contract under *Toussaint v. Blue*

---

1. It is undisputed that Mitchell originally suffered from a form of MS known as "exacerbation-remission," which caused occasional episodes of severe debilitation yet allowed Mitchell to function normally at other times.

2. *See also* Letter from Hildreth Bailey to M. Scott Mitchell, January 16, 1985, Exhibit 33 to Deposition of M. Scott Mitchell, vol. II (Pl. 46); Letter from Gary Hutchinson to James Pease, December 3, 1985, Exhibit 26 to Deposition of M. Scott Mitchell, vol. II.

3. The precise size of the transfer, and of its impact on Mitchell's earning power, is disputed

and appears to depend on the way in which it is calculated. *See* Deposition of M. Scott Mitchell, vol. I, at 111.

4. Mitchell avers that his physician, Ronald Taylor, M.D., directed him on January 26, 1987, to stop working. Response to Motion for Summary Judgment at 10, *citing* Deposition of M. Scott Mitchell, vol. I, at 144. Mitchell claims that he returned to work on December 11, 1986, and except for his traditional week off at Christmas reported to work every day until January 27, 1987.

*Cross and Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880 (1981)) that the company acted in a "blatant attempt to force [him] either [to] resign or to apply for long-term disability" without good cause. Complaint at 3, paragraph 15.

## I.

The factual basis of Mitchell's *Toussaint* claim is that he was forced to cease working as of January 27, 1987, because the company's actions during December 1986 and January 1987 caused him such physical and/or psychological harm as to make his previously non-disabling medical condition permanently disabling.[5] *See* Deposition of Michael F. Abramsky, Ph.D., at 23–27; Deposition of Ronald S. Taylor, M.D., at 24–29; Deposition of Robert Lisak, M.D., at 28–29, 39–43, 49–54.

### A.

■ To survive a motion for summary judgment on a claim under *Toussaint,* a plaintiff must first show a genuine fact issue as to the existence of an implied just-cause termination contract. In the case at bar, Mitchell attests that,

> I was promised by every supervisor I had ... that my job tenure, Book of Business and the brokers I developed or [who] were assigned to me, were secure as long as my peformance met company standards; [and] that neither accounts nor producers would be removed from my Book of Business involuntarily unless the broker or client requested a change or in the event I demonstrated an inability to adequately perform my job duties with regard to those accounts or brokers.

Affidavit of M. Scott Mitchell, Attachment to Response to Motion for Summary Judgment, at 4–5. *See also* Deposition of M.

Scott Mitchell, Vol. I, at 73–79; Vol. II, at 3–4.

This Court believes that Mitchell has raised a genuine issue of fact as to whether CG policies, as communicated to him either orally or in writing over the period of his employment, amounted to an implied contractual agreement that he would be terminated only for just cause. *Schipani v. Ford Motor Co.,* 102 Mich.App. 606, 612, 302 N.W.2d 307 (1981).

### B.

Mitchell contends that his inability to work was analogous to the reasonable unwillingness of the plaintiff to work in *Jenkins v. American Red Cross,* 141 Mich. App. 785, 798, 369 N.W.2d 223 (1985).[6] *Jenkins* held that an employee was constructively discharged when he reasonably found his working conditions intolerable and ceased to report to work. Mitchell argues that *Jenkins* covers any employee who is faced with an impossible choice between (a) ceasing to work and (b) working under conditions which he reasonably finds unacceptable.

■ After a review of the record herein, this Court believes that Mitchell has raised genuine issues of fact as to whether CG's actions caused the sudden, severe and irreversible decrement in Mitchell's ability to function which allegedly changed his pre-existing, non-disabling condition into a permanent and total disability as of January 27, 1987. Mitchell argues that when he became disabled, he had no medical choice but to stop working. This is an *a fortiori* presentation of the *Jenkins* issue, since the plaintiff in that case was healthy enough to work but made a reasonable personal choice not to do so.

This Court concludes that if Mitchell proves a proximate causal connection be-

---

5. CG contends, and Mitchell does not dispute, that CG disability benefits accrue, by company policy, only to active employees. The company considers its disabled employees "active" at all times while they receive disability benefits. CG argues that Mitchell may not simultaneously sue for wrongful discharge and reap the rewards (*i.e.,* disability benefits) of his status as an active CG employee.

However, Mitchell's *Toussaint* claim is based in part on the theory that he was constructively terminated—even though his employment relationship was not formally severed—when CG caused him to be unable to work after January 27, 1987. *See* discussion *infra.*

6. *See also Held v. Gulf Oil Co.,* 684 F.2d 427, 432 (6th Cir.1982).

tween CG's actions and the adverse change in his physical condition which he claims disabled him permanently, then he has proven at least a partial constructive termination[7] under *Jenkins,* 141 Mich.App. at 798, 369 N.W.2d 223. Of course, if Mitchell proves that "the foreseeable impact of defendant's conduct was that [Mitchell's] working conditions would become so difficult and unpleasant that he would be compelled to resign," *id.,* he has met the *Jenkins* test to the same extent. This Court discerns no reason under Michigan law not to hold a constructive termination or forced resignation under *Jenkins* equivalent to an actual discharge for *Toussaint* purposes.

### C.

This Court must also take account of Mitchell's claim that CG's unilateral changes in his working conditions in December 1986 amounted in themselves to a breach of an implied contract under *Toussaint.* The Court therefore proceeds to inquire whether Michigan law affords a *Toussaint* remedy to the extent of the harms caused by demotions, pay cuts, or derogations in working conditions.

In *Bullock v. Automobile Club of Michigan,* 146 Mich.App. 711, 715–17, 381 N.W. 2d 793 (1985), the Court held that summary disposition was inappropriate to adjudicate an insurance sales representative's claim that he was "demoted" from "commissioned salesperson" to "salaried member advisor." In *Dumas v. Auto Club Insurance Ass'n,* 168 Mich.App. 619, 629, 425 N.W.2d 480 (1988), the Court held, in reliance on *Bullock,* that an insurance company's unilateral change in its compensation policies created a genuine issue of fact as to the breach of an implied contract with the company's salespeople under *Toussaint.*[8]

This Court concludes that under Michigan law, an aggrieved employee may invoke *Toussaint* to contest an employer's unilateral modifications, as well as total repudiations, of an implied contract of employment. *Dumas,* 168 Mich.App. at 628, 425 N.W.2d 480, *citing Bullock,* 146 Mich. App. at 719–20, 381 N.W.2d 793. This Court believes that genuine issues of fact remain as to whether CG's actions on or about December 9, 1986, constituted a breach of an implied contract of employment. *Schipani,* 102 Mich.App. at 612, 302 N.W.2d 307. Thus, even were the Court to conclude that Mitchell had not been constructively terminated within the meaning of *Jenkins,* summary judgment would be inappropriate to decide Mitchell's *Toussaint* claim.

### II.

Mitchell's handicap discrimination claim does not depend on his theory of constructive discharge. *Sumner v. Goodyear Tire & Rubber Co.,* 427 Mich. 505, 398 N.W.2d 368 (1986). The Court therefore considers the two claims independently.

Under the Michigan Handicappers' Civil Rights Act ("MHCRA"), M.C.L. § 37.1101 *et seq.,* one who claims discrimination must first make out a *prima facie* case of bias. *Carden v. General Motors Corp.,* 156 Mich.App. 202, 210–11, 401 N.W.2d 273 (1986), *citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If this threshold burden is satisfied, the Defendant must then produce evidence that a legitimate non-discriminatory reason existed for the acts of which the Plaintiff complains. If the defense satisfies this requirement, the burden shifts back to the Plaintiff, who must prove by a preponder-

---

**7.** This Court does not now decide whether complete termination occurred. The questions of Mitchell's present status as an employee, and of the precise nature of CG's personnel action with respect to him, *see* n. 5 *supra,* are matters for the trier of fact to determine.

**8.** *Cf. Sepanske v. Bendix Corp.,* 147 Mich.App. 819, 826, 384 N.W.2d 54 (1985), in which the Court acknowledged (though it was undisputed by the parties) that a policy manual of the defendant company guaranteed an employee's reinstatement, after a leave, "to his former position or to a position of equal or greater responsibility."

ance of the evidence that the reason given was merely a pretext for discrimination. *Carden*, 156 Mich.App. at 211, 401 N.W.2d 273.

The *prima facie* test for handicap discrimination under the MHCRA is whether a plaintiff could perform his job duties at the time the allegedly discriminatory act occurred. *Wilson v. Acacia Park Cemetery*, 162 Mich.App. 638, 643–44, 413 N.W.2d 79 (1987). CG claims that because Mitchell could not call on accounts personally or come to the office regularly during November and early December 1986, he cannot meet his *prima facie* burden under *Wilson* to show that he is a member of the group whom the MHCRA protects.

In *Carr v. General Motors Corp.*, 425 Mich. 313, 321–22, 389 N.W.2d 686 (1986), the Court held that the literal language of section 202 of the MHCRA, M.C.L. § 37.1202, imposed a duty of accommodation on an employer only where the handicap was "unrelated to the individual's ability to perform the duties" of the job. However, the *prima facie* test of *Wilson* and *Carr* is not whether a handicap interfered with a hypothetical employee's performance, but whether a particular employee— here, Mitchell himself—could perform his job duties in their totality despite his impairments.

It is undisputed that Mitchell had MS from 1973 onward, yet during that period compiled a performance record—including his figures for 1986, the year of his greatest medical difficulties—more impressive than those of his non-impaired colleagues in CG's Detroit office. The parties vigorously dispute (a) the elements of adequate performance for a person in Mitchell's post, and (b) the extent to which Mitchell met those requirements.

■ This Court concludes, from a review of the evidence of record, that genuine issues of fact exist on the material question whether Mitchell could perform his job at the time of CG's allegedly discriminatory actions.

Moreover, fact questions exist with respect to the company's intent or motive in reassigning portions of Mitchell's work to other CG employees in December 1986. CG argues, in essence, that it made a reasonable business judgment in December 1986 that Mitchell could no longer handle his assigned workload. However, the record shows that the decision of CG's Detroit office supervisor with regard to Mitchell in December 1986 differed dramatically from that same official's plan for him and his accounts in mid–1985. Mitchell alleges that the company's 1986 reassignment decision was grounded in bias concerning his abilities. Questions of motive or design are quintessentially matters for the factfinder to determine. *Bogue v. Teledyne Continental Motors*, 136 Mich.App. 374, 378, 356 N.W.2d 25 (1984), *leave to appeal denied*, 421 Mich. 862 (1985), *cited in Carden*, 156 Mich.App. at 211–212, 401 N.W.2d 273.

Finally, CG contends that it took the actions of which Mitchell complains in order to promote the efficiency of its Detroit office operations. *See* Letter from Hildreth Bailey to M. Scott Mitchell and Margaret Mitchell, December 6, 1986, exhibit E to Motion for Summary Judgment. However, the record contains at least some support for Mitchell's claim that CG's stated reason for reassigning certain of his accounts—*i.e.*, to promote office efficiency —was merely a pretext for the discrimination of which he complains. It is undisputed that the Bailey letter of December 6, 1986, described a surprise change in Bailey's previously stated plans for Mitchell, and entailed a greater reduction in a salesperson's earning capacity than had ever been made in CG's Detroit office except to discipline an employee.

This Court believes that Mitchell has met his burden under *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), to show a genuine issue of fact in avoidance of summary judgment on his handicap claim. The existence of critical fact issues makes it impossible to render judgment for CG as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The Court declines to hold, as CG has urged, that

Mitchell's interest in presenting his handicap discrimination claim to a jury is outweighed by the possible discouraging effect of a denial of summary judgment in this matter upon the general willingness of employers to hire the handicapped.

## III.

On August 17, 1988, Mitchell moved to amend his Complaint to "add a new theory," to wit, "that Defendants are contractually bound by their own policies concerning discrimination against, and accommodation for, handicappers." Brief in Support of Motion for Leave to Amend at 1.

In its opposition to the motion, CG argues that (a) the motion is futile since the amendment fails to state a claim, and (b) any amendment at this stage of the proceedings would unduly prejudice the Defendants, since they would be required to take further discovery of certain witnesses who have already been deposed, and the discovery period in this case has closed.

### A.

■ Fed.R.Civ.P. 15(a) provides that "leave [to amend a Complaint] shall be freely given when justice so requires." Leave must ordinarily be considered, if not granted, even when an opposing party's summary judgment motion is pending. *Ellison v. Ford Motor Co.*, 847 F.2d 297, 300 (6th Cir.1988).

■ However, where an amendment would add no viable claims to the Complaint, it may be denied. *Addington v. Farmers Elevator Mutual Insurance Co.*, 650 F.2d 663, 667 (5th Cir.1981). The Court therefore proceeds to examine Mitchell's proffered amendment under the standard of Fed.R.Civ.P. 12(b)(6), *i.e.*, whether the amendment states a claim upon which relief can be granted. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed. 2d 80 (1957) (dismissal of claim appropriate where it "appears beyond doubt" that plaintiff can prove "no set of facts" in support thereof which would entitle him to relief).

In its opposition to the motion for leave to amend, CG cites *Hoopes v. Equifax*, 611 F.2d 134, 135 (6th Cir.1979). *Hoopes* held that section 503 of the Vocational Rehabilitation Act of 1973 ("VRA"), 29 U.S.C. 793, afforded no private right of action under which an employee could challenge his termination on the theory that he was a third-party beneficiary of an anti-discrimination "contract" between the employer and the United States.

In the instant case, however, Mitchell claims no benefit from an alleged contract between CG and the federal government. Rather, he contends that CG's internal policies prohibited discrimination against handicapped employees, and that for CG to terminate an employee based on such discrimination would violate the terms of the implied just-cause termination agreement between Mitchell and the company under *Toussaint.*[9]

Moreover, the record herein is silent, and it would be inappropriate for the Court to inquire, as to whether CG adopted its handicappers' policy merely to meet a requirement of section 503 or whether the company did so for other reasons. Thus, section 503 is reduced to a virtual irrelevancy, making *Hoopes* and the other section 503 cases cited by CG inapposite. As neither Michigan nor federal law appears to preclude Mitchell's handicap policy claim, the Court determines that Mitchell's proffered amendment must not be dismissed under Fed.R.Civ.P. 12(b)(6).

### B.

■ This Court must interpret the discovery Rules so as to "secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1. Mitchell does not dispute CG's assertion that he has possessed since April 1988 the information upon which his amendment is based. Where a proffered amendment to a Complaint would add new or different issues to a case in which discovery has closed and trial is imminent, the Court has discretion to deny the amendment. *Murphy v. White*

9. *See* discussion *supra.*

*Hen Pantry Co.,* 691 F.2d 350, 353 (7th Cir.1982), *citing Troxel Mfg. Co. v. Schwinn Bicycle Co.,* 489 F.2d 968, 970–71 (6th Cir.1973), *cert. denied,* 416 U.S. 939, 94 S.Ct. 1942, 40 L.Ed.2d 290 (1974).

In view of Mitchell's assertion that no new or additional discovery would be required if his motion for leave to amend were granted, the Court grants his request, subject to the following conditions: (1) that discovery be re-opened for thirty (30) days from the date hereof, for the sole purpose of permitting CG to take any discovery which it reasonably requires with regard to issues raised by Mitchell's amendment(s); (2) that the final pretrial conference and trial in the instant cause be postponed to a date and time to be set by the Court, and (3) that Mitchell bear the costs of re-deposing any witness deposed by either party after April 1988 who must now be deposed again under this Order. If this Court receives written notification, within five (5) days from the date hereof, that Mitchell chooses not to accept the above conditions, then his motion for leave to amend his Complaint shall be denied, and the pretrial conference and trial dates in the present record shall remain in force.

IT IS SO ORDERED.