NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0105n.06

Case No. 17-5850

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Mar 02, 2018
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| SUE SMITH, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| LHC GROUP, INC., a Delaware Corporation; | ) | KENTUCKY |
| KENTUCKY LV, LLC, a Kentucky limited | ) | |
| liability company, dba Deaconess – Lifeline | ) | |
| Home Health, | ) | |
| | ) | |
| Defendants-Appellees. | | |

_____/

Before: MERRITT, MOORE, and BUSH, Circuit Judges.

## I. Introduction

**MERRITT, Circuit Judge.** This case under the False Claims Act, 31 U.S.C. §§ 3729–31, arises from plaintiff Sue Smith's allegations against the defendants, her employers, LHC Group, Inc., and Kentucky LV, LLC, for perpetrating health care fraud on the federal government by seeking and receiving fraudulent reimbursements. Rather than participate in the fraud, she quit her job as Director of Nursing with the defendants. She apparently did so as a matter of conscience and to avoid suspicion in any future investigation by the government. She then sued her employers for damages under a theory of "constructive discharge," or

discrimination "in the terms and conditions of employment because of lawful acts done by the employee . . . to stop 1 or more violations" of the False Claims Act by her employers.[1]

The district court dismissed Smith's case as failing to state a valid cause of action as follows:

> Even accepting all of Smith's claims as true, as the Court must, and assuming *arguendo* that such a theory could constitute "intolerable working conditions" . . . her claim must fail. Smith's theory focuses solely on the allegedly insufferable working conditions she faced, but it ignores that a prima facie case of constructive discharge <u>requires that an employer also act with an intention to force an employee to quit his or her job.</u> . . . Smith's complaint tells the story of an employee who unwittingly became trapped working for a company who adopted a business model based on fraud, and despite efforts to follow protocol, had no real control over the decisions being made. Quite reasonably, Smith felt like she had to quit her job. But where her claims fails is that she has not alleged that Defendants perpetrated the alleged fraud . . . <u>with the specific intention</u> of forcing her to do so.
>
> On this point, Smith contends that Defendants, by virtue of their allegedly fraudulent scheme, acted intentionally by sanctioning practices that violated the law. By supporting such behavior, Smith argues, Defendants essentially presented her with a choice, which she argues meets the intentionality requirement: to go along and get along or quit. The problem is that Smith does <u>not allege facts that show Defendants did anything directly toward *her* to make *her* quit *her* job.</u> In other words, she does not tether her employer's actions to the necessary requirement that the employer's actions were done with the intent to have Smith quit her job.

*Smith v. LHC Grp., Inc.*, No. CV 5:17-15-KKC, 2017 WL 2838048, at *3–4 (E.D. Ky. June 30, 2017) (emphasis added) (citations omitted).

---

[1] The False Claims Act provides for a statutory tort action in favor of employees who resist fraud against the government by an employer at 31 U.S.C. § 3730(h), as follows:

> (1) In general.--Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.
>
> (2) Relief.--Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

The meaning of the federal statute is not clear on the question of interpretation before us. The federal question before us is whether under § 3730(h) the district court is correct that an employer like the LHC Group, Inc., here must have a conscious "specific intention," or a subjective intent, for the employee to resign. We conclude that the intent required by the statute is a more general intent that takes into account all of the circumstances in addition to the employer's "specific intention." The case must therefore be remanded for trial not limited to the defendant corporation's "specific" or subjective intent but including all of the factors that led to the plaintiff's resignation.

If the employee is left to think she may be charged with fraud by the government if she remains as Director of Nursing, a jury may find that her employer's fraudulent behavior is imposing on her fear that would cause a reasonable employee to resign. The jury may find that the employer's alleged fraudulent behavior plus the employee's moral conscience and reasonable fear of being accused of participating in the employer's fraud is enough to justify quitting. Whether we call her resignation a "constructive discharge," "harassment" or a form of discrimination, the employee should be made "whole" under the statute and accorded the "relief" set out in section (2) of § 3730(h) if the jury finds in her favor.

## II.      Factual Background

Sue Smith worked as the Director of Nursing for home healthcare providers LHC Group, Inc., and Kentucky LV, LLC, at LHC's home health office in Lexington, Kentucky. Smith claims that she had to quit her job because defendants LHC and Kentucky LV engaged in healthcare fraud and endangered patients.

LHC Group receives new patients when another healthcare provider—such as a physician, hospital, or nursing home—refers a patient to defendants for a specific home healthcare service, such as physical therapy. As Director of Nursing, Smith reviewed these patient referrals and determined whether LHC had the available staff on-hand to fulfill the doctor's orders and adequately care for the patient. Smith had the authority to either accept the new patient or recommend that management decline the referral.

If Smith accepted a patient, the enrollment process began with a clinical assessment of the patient's medical needs to determine whether the home healthcare plan should deviate from

the doctor's orders. Clinical staff might find that the prescribed services were not feasible for the patient or that the services needed to be supplemented by additional services. If the provider believed that modification was needed, the doctor was to be given the opportunity to make the final decision as to whether the change was appropriate. After accepting a referral, Smith completed paperwork necessary to secure payment from Medicaid, Medicare, or private insurance.

Smith alleges that she discovered that other employees regularly bypassed the proper procedure and admitted patients without the requisite clinical evaluation or documentation. When LHC could not accommodate a patient's medical needs, other employees allegedly admitted the patient regardless and changed the doctor's orders to match the availability of their clinical staff. In other instances, LHC employees allegedly admitted patients without the proper documentation from a medical doctor.

Smith states that she reported the scheme to senior management personnel on numerous occasions, but management invariably ignored her complaints. According to Smith, LHC not only tolerated the fraud but in fact welcomed its profitability. One senior manager allegedly told her that the fraudulent scheme brought in $6 million annually.

Smith claims that she had to choose between resignation and turning a blind eye to the fraud. Although Smith did not manipulate the patient enrollment process herself, Smith's duties as Director of Nursing required her to allocate clinical staff to new patients and fill out payment paperwork from Medicare, Medicaid, and private insurers. Smith felt that continuing to fulfill these duties would inevitably require her to facilitate fraud and also violate the Kentucky licensing provisions for registered nurses. *See* KRS 314.091(1). Faced with the dilemma of losing her job or being party to an illegal and unethical scheme, Smith resigned.

Subsequently, Smith sued LHC Group, Inc., and Kentucky LV, LLC, claiming that they violated the False Claims Act by constructively discharging her in retaliation for her reports and violated Kentucky state law by wrongfully discharging her based on her refusal to violate Kentucky law. Defendants ("LHC") filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion with respect to all counts. *Smith v.*

*LHC Grp., Inc.*, No. CV 5:17-15-KKC, 2017 WL 2838048, at *1–7 (E.D. Ky. June 30, 2017). Smith now appeals the dismissal of these claims.

### III.    False Claims Act Claim

We review de novo a district court's grant of a motion to dismiss. *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012). A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The question in this appeal is whether the plaintiff, Smith, adequately alleged that she suffered a discharge or adverse employment action when she felt it necessary to resign her job as Director of Nursing because her employer continued to defraud the government. LHC did not fire or demote Smith. LHC claims that it did not seek her resignation and took no adverse employment action that could constitute a discharge, demotion, or other action for which it should be held liable under § 3730(h). Smith alleges that her employer ignored her complaints and required her to continue working as she had prior to her report while LHC continued defrauding the government. Smith quit to avoid being implicated in what she perceived to be an illegal and unethical scheme and because she could not in good conscience remain an employee.

Smith acknowledges that she was not fired but argues that her claim survives because LHC "constructively discharged" her. Constructive discharge occurs when "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982) (quoting *Bourque v. Powell Elec. Mfg.*, 617 F.2d 61, 65 (5th Cir. 1980)).

The district court found that Smith's complaint fails to allege the elements of intolerable working conditions and employer intent to force the employee to quit. *LHC Grp.*, 2017 WL 2838048, at *4. We disagree. First, taking Smith's allegations as true, we find that a jury could find that LHC created intolerable conditions by ignoring Smith's complaints of illegal activity. Her conditions must be analyzed "from the perspective of *a reasonable person in the position that* [the plaintiff] *was in at the time of her discharge.*" *Williams v. Caterpillar Tractor Co.*,

770 F.2d 47, 50 (6th Cir. 1985). A jury may conclude that it is damaging to a professional to require her to engage in activity she considers illegal and immoral with the threat of prosecution and loss of her nursing license looming in the background.

The defendants analogize Smith's case to *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 716 (7th Cir. 2014), in which the Seventh Circuit decided in favor of a healthcare facility which had been sued for retaliation on a theory of constructive discharge. In that case, a nurse's supervisors responded with hostility when she complained about substandard, unhygienic conditions at the facility. *Id.* The nurse quit, believing that the conditions had led to a patient's death. *Id.* The Seventh Circuit found that no constructive discharge occurred because, despite the regulatory violations, the facility had done nothing to make the plaintiff's employment sufficiently unbearable to constitute a constructive discharge. *Id.* We find that *Absher* is distinguishable from Smith's case. The nurse in *Absher* was not required to provide substandard care or otherwise entangled in her coworkers' failure to provide proper healthcare. Smith, in contrast, pleads that her administrative role required her to supervise and implement patient orders and complete paperwork necessary to secure Medicaid and Medicare funding. Smith's knowledge of her coworker's scheme to improperly change patient orders prior to clinical evaluation could have exposed her to investigation and prosecution. The jury may conclude that if the employee is left to worry about whether she will be charged with fraud by the government if she remains on the job, her employer's fraudulent behavior is imposing on her a state of mind that would cause a reasonable employee to resign. Whether a constructive discharge occurred "depends upon the facts of each case." *Held*, 684 F.2d at 432.

The next question before us is whether the district court is correct in the opinion quoted above that the constructive discharge doctrine requires that the employer must have a conscious "specific intention," *i.e.*, a subjective intent, for the employee to resign. *See LHC Grp.*, 2017 WL 2838048, at *3–4 (emphasis added) (citations omitted).

We disagree with the district court's narrow reading of intent because it focuses only on the outcome LHC specifically desired—profits from the scheme—and fails to take into account the foreseeable consequences of their actions. The Restatement (Second) of Torts § 8A cmt. b (Am. Law Inst. 1965), states:

> Intent is not . . . limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.

This circuit has adopted a similarly broad definition: in constructive discharge cases, an employer's "[i]ntent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080–81 (6th Cir. 1999). Our constructive discharge case law is rooted in the "well recognized rule in labor relations law that 'a man is held to intend the foreseeable consequences of his conduct.'" *Held*, 684 F.2d at 432.

A number of other circuits in constructive discharge cases reject the intent requirement entirely and apply only the objective test of whether the working conditions became so intolerable that a reasonable person would feel compelled to resign.[2] The U.S. Supreme Court has also omitted employer intent from its definition of constructive discharge. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 153 (2004) (Thomas, J., dissenting) (disagreeing with the absence of any discussion of intent or "deliberate[ness]" in the majority's opinion).

The history of constructive discharge doctrine in our circuit closely mirrors its development in the Tenth Circuit. As in our circuit, the Tenth Circuit originally limited constructive discharge to cases where (1) "a reasonable man would view the working conditions as intolerable," and (2) the employer deliberately created the conditions "to force the employee to quit." *Irving v. Dubuque Packing Co.*, 689 F.2d 170, 172 (10th Cir. 1982). The Ninth Circuit commented on the confusion which had resulted from the Tenth Circuit "purport[ing] to embrace the reasonable employee standard *as well as* the employer's-subjective-intent standard." *Satterwhite v. Smith*, 744 F.2d 1380, 1383 n.4 (9th Cir. 1984). The Tenth Circuit subsequently

---

[2] For examples of circuits applying an objective test, see, *e.g.*, *Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 331 (3d Cir. 2016); *E.E.O.C. v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 134 (1st Cir. 2014); *Knappenberger v. City of Phoenix*, 566 F.3d 936, 940 (9th Cir. 2009); *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 991 (5th Cir. 2008); *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1325 (10th Cir. 2004); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir.1997); *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 536 (7th Cir. 1993). *But see Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 308 (2d Cir. 2017) (requiring "evidence of the employer's intent to create an intolerable environment that forces the employee to resign"); *Lisdahl v. Mayo Found.*, 633 F.3d 712, 718–19 (8th Cir. 2011) (requiring proof "demonstrating that the resignation was a reasonably foreseeable consequence of the employer's actions"); *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir. 2004) (quoting *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985)) (requiring "a calculated effort to pressure [plaintiff] into resignation through the imposition of unreasonably harsh conditions").

clarified its unwieldy standard in *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 343 (10th Cir. 1986), with an "unqualified adoption of th[e] objective standard" set out by the Fifth Circuit in *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61 (5th Cir. 1980).

In *Bourque*, the Fifth Circuit had found that a rule focused on the employer's intent is "inconsistent with . . . the realities of modern employment" and stated that its test would not "attempt to divine the state of mind of the employer." *Bourque*, 617 F.2d at 65. Thus, *Bourque* found constructive discharge any time conditions become "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* Under this objective standard, the "employer's subjective intent is irrelevant; [the employer] must be held to have intended those consequences it could reasonably have foreseen." *Derr*, 796 F.2d at 344 (emphasis omitted) (quoting *Clark v. Marsh*, 665 F.2d 1168, 1175 n. 8 (D.C. Cir. 1981)).

The Fifth Circuit *Bourque* case is important because our circuit joined the Tenth Circuit in applying the *Bourque* approach. *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982) (describing our standard as "in accord with the [*Bourque*] rule in the Fifth Circuit"). Indeed, some Sixth Circuit cases from that period conform to the purely objective *Bourque* approach and omit any discussion of employer intent altogether. *See, e.g.*, *Williams v. Caterpillar Tractor Co.*, 770 F.2d 47, 50 (6th Cir. 1985). However, as demonstrated by the district court's conclusion that "specific intent" is required, this circuit's subsequent case law may have failed to sufficiently clarify what we meant in *Held*.

We therefore clarify that the standard described by *Held* is ultimately an objective one. The employee alleging constructive discharge need not prove that his or her employer undertook actions with the subjective intention of forcing the employee to quit. Rather, the *Held* intent requirement can be satisfied so long as the employee's resignation was a reasonably foreseeable consequence of the employer's actions. *Held*, 684 F.2d at 432; *Moore*, 171 F.3d at 1080. Taking the facts of the complaint as true and drawing all reasonable inferences in favor of Smith, her repeated complaints to management concerning illegal activity should have enabled LHC to foresee that failure to take action against the fraudulent scheme would compel Smith to leave.

The defendants support the district court's requirement of subjective intent also by arguing that the statute itself, § 3730(h)(1), requires the employer to have a "retaliatory" motive

when it says that the employer must take adverse employment action "because of lawful acts done by the employee" to counteract the employer's fraud. But the statute also states that a court adjudicating such a fraud claim should provide "all relief necessary to make that employee . . . whole" if she is "discriminated against in the terms and conditions of employment." Here the jury may find that the employee is seriously harmed when the defendant continues its fraud and subjects the plaintiff to possible prosecution as Director of Nursing and to the loss of her nursing license and reputation. This court can hardly be said to provide "all relief necessary" if it should impose a subjective intent requirement.

### IV. Wrongful Discharge Claim under Kentucky State Law

Smith additionally appeals the district court's dismissal of her wrongful discharge claim under Kentucky law. The district court dismissed for failure to state a claim. *Smith v. LHC Grp., Inc.*, No. CV 5:17-15-KKC, 2017 WL 2838048, at *6–7 (E.D. Ky. June 30, 2017). We reverse.

Generally, Kentucky law permits an employer to discharge an employee at-will for any reason: "for good cause, for no cause, or for a cause that some might view as morally indefensible." *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983). However, the Commonwealth carved out a narrow exception for employees who are "wrongfully discharged," *i.e.*, terminated for reasons "contrary to a fundamental and well-defined public policy as evidenced by existing law." *See Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985).

There are "only two situations" where the grounds for discharge "are so contrary to public policy as to be actionable absent explicit legislative statements prohibiting the discharge": (1) when "the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment" and (2) "when the reason for a discharge was the employee's exercise of a right conferred by well-established legislative enactment." *Id.* at 402 (internal quotations omitted).

Smith's claim arises under the first situation.[3] The Kentucky licensing statute for registered nurses makes it unlawful for a nurse to act in a manner inconsistent with the practice

---

[3] As explained by the district court, Smith has no claim under the second situation—referred to as the "protected activity" exception—because this exception only applies when the employee reports illegal activity to public

of nursing, *see* KRS 314.091(1)(d), or to falsify an essential record, *see* KRS 314.091(1)(h). Smith's complaint asserts that she was wrongfully discharged because her only options were to violate KRS 314.091(1) or resign.[4]

The district court dismissed her claim on the theory that Smith failed to allege a refusal to violate the law because Smith did not allege that her employer first specifically asked her to do so. On appeal, we must determine whether Smith's claim can survive despite the absence of any allegation that LHC affirmatively requested that Smith violate the law. *Cf. LHC Grp.*, 2017 WL 2838048, at *6.

Although district courts have consistently held that a Kentucky wrongful discharge claim requires proof of an affirmative request,[5] no authoritative Kentucky case has created such an element. The Kentucky Supreme Court has stated in dicta that a "request" is necessary to provide the basis for a wrongful discharge claim, but the Court did not discuss what such a request must entail. *Hill v. Kentucky Lottery Corp.*, 327 S.W.3d 412, 422–23 (Ky. 2010), *as modified on denial of reh'g* (Dec. 16, 2010). One Kentucky Court of Appeals decision held that a plaintiff "must show an affirmative request to him/her by the employer to violate the law," but the Kentucky Supreme Court ordered that this case not be published. *See Welsh v. Phoenix Transp. Servs.*, No. 2007-CA-001231-MR, 2009 Ky. App. LEXIS 137, at *13 (Ky. Ct. App. Aug. 14, 2009) (unpublished); *Welsh v. Phoenix Transp. Servs.*, 2010 Ky. LEXIS 547 (Ky., Mar. 10, 2010) (denying review).

We recently called the affirmative request requirement into question in *Alexander v. Eagle Mfg. Co., LLC,* No. 16-6604, 2017 WL 4900457, at *3 (6th Cir. Oct. 31, 2017). In *Alexander*, we found that the Kentucky Supreme Court case law "did not create an additional element—an explicit request from the employer that the employee violate the law" and that

---

authorities, which Smith did not do. *LHC Grp.*, 2017 WL 2838048, at *7 (citing *Zumot v. Data Mgmt Co.*, No. 2002-CA-002454-MR, 2004 WL 405888, at *1 (Ky. Ct. App. March 5, 2004)).

[4] Smith's complaint additionally alleged a separate theory of "wrongful discharge" based on Smith's refusal to violate the federal False Claims Act. The district court dismissed this claim because Kentucky courts limit "well-defined public policy" to Kentucky statutes or constitutional provisions. *LHC Grp.*, 2017 WL 2838048, at *5. Smith does not appeal the dismissal of this claim.

[5] *See, e.g.*, *Alexander v. Eagle Mfg. Co., LLC*, No. CV 15-127-DLB-JGW, 2016 WL 5420573, at *3–4 (E.D. Ky. Sept. 27, 2016), *aff'd*, No. 16-6604, 2017 WL 4900457 (6th Cir. Oct. 31, 2017) (citing *Hill v. Kentucky Lottery Corp.*, 327 S.W.3d 412, 421–22 (Ky. 2010)); *Charles Print Fulfillment Servs., LLC*, No. 3:11-CV-00553-TBR, 2015 WL 5786817, at *7 (W.D. Ky. Sept. 30, 2015) (citing *Welsh v. Phoenix Transp. Servs.*, No. 2007-CA-001231-MR, 2009 Ky. App. LEXIS 137, at *12 (Ky. Ct. App. Aug. 14, 2009)).

*Welsh* is less compelling because it is unpublished. 2017 WL 4900457, at *3. We concluded that the reasoning behind the exception suggested a broader construction of the word "request":

> Presumably, the policy behind this exception is to prevent an employee from having to choose between losing his job and breaking the law. That policy is implicated, of course, when an employer affirmatively requests that the employee violate the law. But it is also implicated when an employee learns of illegal activity and, although not directly invited to participate by his employer, knows he will inevitably become complicit in the illegality by performing his normal work responsibilities. We think it likely that the Kentucky Supreme Court would apply this exception to not only the former situation, but also the latter.

*Id.* at *4 (citations omitted).

We agree with the analysis in *Alexander*. Taking the facts alleged in her complaint as true, Smith found herself in exactly such a situation, knowing—even in the absence of direct instructions to violate the law—that her continued employment would inevitably lead to authorizing fraudulent patient orders and other fraudulent entanglements. LHC responded with indifference to Smith's concern that her duties as Director of Nursing would make her complicit in the fraud. According to Smith, LHC even endorsed the fraud's profitability. We agree with the district court that, according to her complaint, "Smith felt she had no option but to comply with allegedly fraudulent business practices of [d]efendants," that this left Smith with no option but "to go along and get along or quit," and that "[q]uite reasonably, Smith felt like she had to quit her job." *LHC Grp.*, 2017 WL 2838048, at *3–4, 6. Unlike the district court, we do find that Smith's situation as described in the complaint states each element of constructive discharge under Kentucky law.

For the foregoing reasons, the judgment of the district court is REVERSED and the case remanded for further proceedings consistent with this opinion.

**JOHN K. BUSH, Circuit Judge, concurring in part and concurring in the judgment.**
I agree with the majority's discussion of Smith's wrongful discharge claim under Kentucky law. I write separately to emphasize the dispositive allegation as to her FCA retaliation claim: potential liability. Smith has sufficiently alleged that her working conditions were intolerable because she has alleged that her duties created a substantial risk that she would lose her nursing license and subject herself to the risk of criminal prosecution. Given this risk, a reasonable employer in LHC's position would have foreseen that its failure to act would force Smith to quit. From this, a jury could find that LHC constructively discharged her.

To show constructive discharge in this circuit, a plaintiff must prove that her employer "deliberately create[d] intolerable working conditions . . . with the intention of forcing" her to quit. *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). This requires proof of "both the employer's intent and the employee's objective feelings." *Ibid.* Working conditions are intolerable when they "would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir. 2003). "The test deliberately sets a high bar, as the law generally expects employees to remain on the job while pursuing relief." *McKelvey v. Sec'y of U.S. Army*, 450 F. App'x 532, 535 (6th Cir. 2011) (internal quotation marks omitted). A plaintiff can prove an employer's intent by showing that "quitting was a foreseeable consequence of the employer's actions" or failure to act. *Moore*, 171 F.3d at 1080; *see West v. Tyson Foods, Inc.*, 374 F. App'x 624, 640 (6th Cir. 2010) (upholding jury's finding of constructive discharge where employer knew of many incidents of harassment against employee and failed adequately to address them).

A jury could find Smith's working conditions were intolerable because the alleged fraud in her workplace put her at risk of liability. Smith's job required her to assign nurses to LHC patients and issue invoices to those patients' insurers. These duties required her to rely on paperwork submissions that her coworkers provided to her. According to her complaint, she discovered that many times these submissions had been unlawfully altered by her coworkers, the results of which were improper staffing assignments and flawed bills. Because Smith had to rely on her coworkers' submissions, and because she had knowledge of her coworkers' past practices, even if she did not *willfully* assign staff incorrectly or submit fraudulent bills, her job would

expose her to *negligence* liability. Indeed, the Kentucky nurse-licensing statute that Smith identified in her complaint provides for the suspension or revocation of a nurse's license when she "[h]as negligently . . . acted in a manner inconsistent with the practice of nursing," KRS § 314.091(1)(d), or "in a negligent manner made incorrect entries . . . on essential records," *id.* § 314.091(1)(h).

Smith alerted LHC management to her coworkers' practices, but they allegedly did nothing to stop the fraud and suggested that they would continue to tolerate it. Based on LHC's choice to tolerate its employees' fraud and not to protect Smith from liability, a jury could find that LHC created Smith's intolerable working conditions.

And finally, Smith's liability risk also provides a sufficient basis for a jury to find that LHC allowed the fraud in her workplace to fester with the intent that Smith quit. A reasonable employer in LHC's position would have foreseen the professional-licensing and criminal-prosecution risks to Smith. But LHC allegedly sat idly by, while its employees' fraud exposed Smith to this liability. LHC knew Smith's predicament, and a reasonable employer would have foreseen that her quitting was a foreseeable consequence of its decision to not act. From this, a jury could infer that LHC tolerated its employees' fraudulent conduct with the intent that Smith quit. *Cf. West*, 374 F. App'x at 640 (concluding that because an employer was aware of several instances of harassment against an employee and refused to address them, the harassed employee's quitting was a foreseeable consequence of that failure so that a jury could find that the employer intended to force her to quit).

\* \* \*

I note in addition that another element a jury would need to address is causation. Although I agree with the majority that Smith has adequately alleged that LHC constructively discharged her, I have my doubts as to whether her allegations show that LHC did so *because* of her complaints. This is ultimately what an FCA retaliation claim requires. The Act does not proscribe all constructive discharges, only those taken in retaliation against an employee who attempts to stop a company from engaging in practices that defraud the government. As the statute provides, an employee is entitled to relief if she is "discharged . . . *because of* lawful acts . . . in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations

of [the FCA]." 31 U.S.C. § 3730(h)(1) (emphasis added). Our court has held that this "because of" language requires the employee to show "a causal connection between the protected activity and the adverse action." *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 346 (6th Cir. 2007). The Supreme Court has interpreted identical language to require a showing of "but for" causation. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (holding that the ordinary meaning of "because of" in the Age Discrimination in Employment Act required a plaintiff to prove that age was the "but-for" cause of the employer's adverse action); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) ("[A] plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."). And based on this Supreme Court precedent, the Third Circuit recently concluded that "retaliation claims under the FCA require proof of 'but-for' causation." *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 78 (3d Cir. 2018).

Both in the district court below and on appeal, the defendants focused solely on the sufficiency of Smith's allegations that LHC constructively discharged her. They did not develop an argument as to whether Smith adequately alleged a causal connection between her complaints to management and the constructive discharge. Although I do not read the majority's opinion as concluding that Smith has shown such a causal connection, I write to clarify that she must make such a showing to prevail.

Smith must show that she was constructively discharged "because of" her alleged protected activity—i.e., her complaints to LHC management. 31 U.S.C. § 3730(h). Stated another way, if she would have been constructively discharged even had she not complained, then she cannot show "but for" causation. She must allege and prove that LHC engaged in some action or inaction such as failing to eliminate the alleged fraud or screen her off from the allegedly fraudulent activity, which resulted in constructive discharge, "because of" her complaints.